(93 Misc. Rep. 692)
### PEOPLE v. PARELLI.

(Court of General Sessions of the Peace, New York County. February, 1916.)

1. MUNICIPAL CORPORATIONS ⬅736—POLICE REGULATIONS—PROSECUTIONS—
   JURISDICTION.

   A Magistrate's Court of the city of New York has summary jurisdiction of cases charging a violation of an ordinance prohibiting any person from exposing any article for sale in any park or parkway, except under permit issued by the commissioner.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1402; Dec. Dig. ⬅636.]

2. JUDGMENT ⬅751—CONCLUSIVENESS—PROSECUTION FOR VIOLATING ORDINANCE.

   The decision of a magistrate on a trial for violating city ordinance, forbidding the exposure of any article for sale in any park or parkway, except under permit, is res judicata on a subsequent trial for the same offense, at the same place, under the same circumstances.

   [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1309, 1310; Dec. Dig. ⬅751.]

3. MUNICIPAL CORPORATIONS ⬅721(1)—POLICE REGULATIONS—APPLICATION
   OF ORDINANCE.

   Under New York City Charter (Laws 1908, c. 135) § 612, giving the park commissioner charge of the management and care of all parks, parkways, and public places in the boroughs over which he has jurisdiction, and of the streets and avenues immediately adjoining them, and giving the commissioner power to authorize and regulate the projections on, and determine the line or curb and surface construction of, streets and avenues lying within 350 feet from the outer boundaries of a park within his jurisdiction, and Laws 1869, c. 890, giving the commissioners of a park power to broaden a street, a resolution by the aldermen, approved by the mayor, could not change a portion included in a street to a park, as affecting the applicability of an ordinance providing that no person shall expose any article for sale in any park or parkway, except under a permit to be issued by the commissioner.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1542; Dec. Dig. ⬅721(1).]

Appeal from Magistrate's Court.

Peter Parelli was convicted of violating an ordinance of the City of New York, on complaint of John R. Ashworth, and appeals. Reversed.

Rutgers B. Miller, of New York City (John Kirkland Clark, of New York City, of counsel), for appellant.

M. H. Murphy, Asst. Corp. Counsel, of New York City, for the People.

MULQUEEN, J. This is an appeal from a judgment of Magistrate House convicting the defendant on a charge of violating a city ordinance by selling newspapers on the west side of Broadway, adjoining Greeley Square Park, without a permit. The magistrate imposed a fine of $25, or in default of payment of the fine directed that he be imprisoned for a period of 15 days.

The ordinance in question is section 12, chapter 17:

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"No person shall expose any article for sale or exhibition, nor perform any personal service for hire, nor take any photograph in any park or parkway except under a permit to be issued by the commissioner."

The appellant maintains that this judgment should be set aside for three reasons: First, that the matter was res adjudicata; second, that the act of the defendant was not a violation of the ordinance; and, third, that the magistrate had no jurisdiction to dispose of the case.

[1] There is no merit in the third point. There is no doubt that the Magistrate's Court has summary jurisdiction in such cases.

[2] As to the first point it appears that prior to the 14th of June the defendant had on two occasions been charged with a violation of the same ordinance, in the same place, and under the same circumstances—that is, selling newspapers at the same place without a permit—and that on the two prior occasions Magistrate Murphy had decided that the act complained of was not a violation of the law.

I am of the opinion that the decision of Magistrate Murphy was an adjudication which was binding on Magistrate House, and that the latter magistrate had no authority to reverse the decision of Magistrate Murphy. The case presents the anomaly of one, Magistrate House, imposing a severe penalty on the defendant appellant for doing an act which Magistrate Murphy had twice declared was entirely proper. Such conflicting decisions would certainly tend to confusion, and would not promote respect for the acts of our magistrates.

[3] I am also of the opinion that the second point taken by appellant's counsel is well founded. I believe defendant had a right to sell newspapers at the place indicated without any permit from any one. In support of the judgment it has been shown that in April, 1894, the following resolution was passed by the board of aldermen of the city and approved by the mayor:

"Resolved, that the area bounded by the south side of Thirty-Second street, the north side of Thirty-Fourth street, the east side of Broadway, and the west side of Sixth avenue, be and it shall hereafter be known as Greeley Square, provided the street number shall not be changed on any thoroughfare mentioned, except as shall be hereafter authorized by the common council."

It is contended that under section 612 of the charter (Laws of 1908, c. 135), the park commissioner had jurisdiction over this square:

"Subject to such general rules and regulations as shall be established by the board, each commissioner shall have charge of the management and be responsible for the care of all such parks, parkways, and public places as are situated in the borough or boroughs over which he has jurisdiction and of the streets and avenues immediately adjoining the same. * * * Subject to the general rules and regulations established by the board, and excepting as otherwise provided in section 612 of this charter, each commissioner shall have power to authorize and regulate the projections on and determine the line or curb and the surface construction of all streets and avenues lying between any park, square or public place within his jurisdiction, or within a distance of three hundred and fifty feet from the outer boundaries thereof."

In Greeley Square there is a small triangular grass plot .144 of an acre in area. It is inclosed by railing. At the northerly corner of the triangle there is a public comfort station, at the southwesterly corner,

within the railing, is a statue of Horace Greeley, and at the south-easterly corner of the triangle—at the corner of Broadway and Thirty-Second street—there is an entrance to the so-called McAdoo tunnel. This triangular space is bounded on the south by Thirty-Second street, on the east by Broadway, and on the west by Sixth avenue. This avenue and these streets had been established as such long before 1894. In fact, Sixth avenue was legally opened as far as Broadway in the year 1828, Thirty-Second street was legally opened from Fifth avenue to Tenth avenue on June 13, 1838, and Broadway was so opened from Twenty-Fifth street to Forty-Fifth street on May 15, 1846.

Prior to 1894, the park commissioner had no jurisdiction over these streets. His only title to authority over them is derived from the ordinance passed in that year. The origin of the park itself, the .144 of an acre lying inside the railings, is not entirely clear. The learned assistant corporation counsel has stated that by chapter 890 of the Laws of 1869 it was provided that:

"The commissioners of the Central Park shall also have power to make that part of Broadway between Thirty-Second and Thirty-Fifth streets, and that part between Forty-Second and Forty-Seventh streets, or any part or parts * * * of a greater width or widths than one hundred feet, and to pre-scribe and direct what part of the open spaces between the said streets caused by the intersection of Broadway with one of the avenues of the said city shall be included as part of Broadway. The said commissioners shall cause duplicate certificates to be made out and certified, in such manner as they may direct, defining and describing the easterly and westerly lines of the part of Broadway aforesaid as located and established by them. * * * The said part of Broadway as laid out and established by the said commis-sioners shall be a part of one of the streets of the city of New York in like manner and with the same effect as if the same had been so laid out as a public street on the map or plan of the said city by the commissioner ap-pointed."

The map showing the easterly and westerly lines of that part of Broadway between Thirty-Second and Thirty-Fourth streets was filed on September 16, 1869. By said map it appears that the easterly line of Broadway between Thirty-Second and Thirty-Fourth streets is the present easterly line thereof, but that the westerly line of Broadway between said streets is the present westerly line of Sixth avenue; so that, as a matter of fact, between Thirty-Second and Thir-ty-Fourth streets, Sixth avenue, as such, does not really exist, and this is borne out further by the fact that the houses on the westerly line of what is apparently Sixth avenue, between Thirty-Second and Thirty-Fourth streets, bear Broadway numbers. So that it is clear that not only is the present westerly side of Broadway a street, but that the alleged park within the railing was legally declared to be a street.

The learned assistant to the corporation counsel has also informed me that he cannot clearly ascertain when this triangular plot was set aside for park purposes. He states that the minutes of the board of aldermen disclose that John H. Starin, in July, 1869, was given a five months' extension of contract to complete parks at this point by inclosing same with an iron railing. He also refers to a report dated

April 19, 1871, in which this triangular plot at Sixth avenue and Broadway, between Thirty-Second and Thirty-Third streets, came for the first time under the supervision of the park department as at present constituted. Said report relates to the "resetting and adjusting the curb and excavation of trees, filling in of holes, taking out of rocks, etc., at this point. The dimensions of the park are for the first time definitely given as .144 of an acre." This acreage has been calculated by the chief engineer of the department of parks and his calculation shows that the present actual inclosure of the park by an iron railing comprises the dimensions of this park and within this railing there is inclosed the acreage aforesaid.

It is clear, therefore, that the land on the westerly side of Broadway, where this boy was arrested, was a street and not a park, and that no legal proceeding was ever taken to make it a park, and that the only jurisdiction that the park department has over this property is derived from the resolution of 1894, to which we have referred. In 1894, therefore, the legal title to these streets was in the city of New York. The mayor, aldermen, and commonalty of the city held them in trust for the public as streets, and no resolution of the board of aldermen, approved by the mayor, could change their character from streets to a park. The beneficiaries of the trust were the people of the city, who had a vested right to use these thoroughfares as streets. It is lawful for this newsboy to sell newspapers on any of the streets of the city without any license from any one, and this right could not be taken from him by the resolution referred to. It was the duty of the city of New York to keep those streets in good condition, so that they might be enjoyed by the people in every lawful way. The city authorities, having the legal obligation to see that the streets were properly maintained, could transfer the care, custody, and control of the streets to the park department; but such action on the part of the city of New York could not give the park department any greater powers than the city itself possessed. The park department derived no right from that resolution to prevent any newsboy from selling papers on those streets, or requiring him to secure a license for that purpose.

It is conceded that the aldermen, with the consent and approval of the mayor, may pass an ordinance requiring a license for the selling of newspapers on the streets of the city; but I have been unable to find such ordinance, and the learned counsel to the corporation has not referred to any. Moreover, such an ordinance must be general in character and would apply to all the newsboys and all the streets. It could not make it legal to sell newspapers at Thirty-First street and Broadway and forbid their sale at Thirty-Second street and Broadway. There is no ordinance in which it is expressly provided that no license should be required for the sale of newspapers.

In chapter 14, article 10, section 130, of the Code of Ordinances, which defines, for the purpose of licensing, the status of persons "hawking, peddling, vending or selling merchandise in the streets of the city," there is an express exemption as to the selling of newspapers. The subdivision provides that "this article shall not apply in any

way to the selling of newspapers or periodicals." Broadway, Sixth avenue, and Thirty-Second street are streets, and the ordinance applicable thereto is to be found in the law affecting all the streets in the city, and not in any regulation of the park commissioner.

It is unnecessary, for the purpose of this action, to discuss the powers of the park commissioner as to the territory embraced within the park proper; that is, the rail space containing .144 of an acre and created a park in some obscure manner, at a time long subsequent to the acquisition by the city of the territory in question for street purposes in the manner prescribed by law for the laying out of streets. As to those streets the city is under the legal duty of maintaining them so that they may be fit for the use of the public. It was this function which was transferred to the park department by the ordinance of 1894.

This so-called square contains some of the most valuable property in the city of New York. Most of the property is improved by very expensive buildings. The owners of the adjoining properties have rights in the streets, but they have no right to prevent a newsboy from selling a newspaper on the street adjoining their property, and it is just as lawful for this newsboy to sell newspapers on the west side of Broadway at this place, and on the east side of Broadway, and on Thirty-Second street, and both sides of Sixth avenue, as on any other street in New York City. Conceding that the city has legally acquired title to .144 of an acre as a park, it has no greater rights in the adjoining street than the owners of the private property abutting on the streets.

It was urged on the argument by the learned assistant corporation counsel that the city had sold the privilege of selling papers on this street for the sum of $75 a month, and that an adverse decision in this case would involve financial loss to the city. It appears that the defendant formerly had a stand on Broadway adjoining the park railing and near the entrance to the tunnel. He paid $30 a month for the "privilege." Subsequently his permit was revoked, and the permit given to the real complainant in this case for $75 a month. The defendant then proceeded to sell his newspapers on the street at the corner of Thirty-Second street and Broadway. He maintained no stand, but carried his stock on his arm, or between his legs. He was thus engaged, creating no disorder, and quietly selling his papers to his old customers, when served with the summons in this action. The holder of the permit complained that this was unfair competition, and that he should have a monopoly in return for the money paid by him to the park department.

I am not called upon to discuss the right of the park commissioner to give a permit to place a stand on Broadway at the opening of the tunnel. The discussion of the legality of such a permit is not before me. The issue is the right of this newsboy, or any other newsboy, to sell papers on that street and all the streets of the city without a license, and I find that that right is clear and absolute. The learned magis-

trate was clearly in error, both in failing to respect the decision of Magistrate Murphy and in his disposition of the case.

The judgment, therefore, must be reversed. It is further ordered that the money which the defendant was compelled to pay under penalty of going to jail for 15 days be returned to him. If a new trial be desired, the time for it may be fixed in the order of reversal, to be settled on notice to the corporation counsel.

Judgment reversed.