THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* WILLIAM J. WILLIAMS, Defendant.

County Court, Suffolk County, February 8, 1946.

*Eugene J. Blumberg* for defendant.

*Fred J. Munder, District Attorney,* for plaintiff.

HILL, J. On the evening of October 3, 1945, William J. Williams, the defendant, while driving a taxicab south on Wellwood Avenue in the village of Lindenhurst, Suffolk County, New York, at about 7:30 P.M., ran into and killed a woman who was walking on the street.

The defendant was indicted by the Grand Jury and now moves for an inspection of the Grand Jury minutes and for the dismissal of the indictment on the following five grounds: (1) That the evidence adduced before the Grand Jury is insufficient in law to warrant the finding of a true bill; (2) that the indictment is based extensively on conflicting evidence; (3) that the indictment is based upon improper and prejudicial testimony; (4) that the indictment is based upon incompetent evidence; and (5) that the evidence adduced before the Grand Jury, that is the proper evidence, is insufficient to support a prima facie case against the defendant.

The motion to inspect is denied. The motion to dismiss is considered by the court on the Grand Jury minutes.

Five witnesses were heard by the Grand Jury, including the defendant who had requested permission of the Grand Jury to be heard, and after waiving immunity was sworn and testified. Two witnesses, exclusive of the defendant, witnessed the accident, namely, Arthur Epsom, a passenger on the front seat of the taxicab, and Dominick Caruso driving south along Wellwood Avenue and to the rear of the defendant's taxicab.

Wellwood Avenue is a wide thoroughfare, between 80 and 100 feet wide, with concrete strips for north and south bound traffic, divided by a macadam strip in the center. The testimony given by Epsom and Caruso is very conflicting. Epsom testified that the taxicab was being driven at a moderate rate of speed, " I would say 20 or 22 — 15 to 22 miles per hour, when suddenly a lady appeared in front of the car as though she came out of the ground. In other words, it was so close that I was really shocked ". Epsom further testified that the lady appeared to be running across the street and the driver had no chance to avoid the accident. Caruso testified that the defendant was going fast.

After the accident the defendant stopped and was hysterical, but otherwise all right, and there was no suggestion that he had been drinking intoxicating liquors.

Williams testified and gave approximately the same version of the accident as did the witness Epsom. Then came the following examination: " Q. Do you have any trouble with your right leg? A. No. I have rheumatism, but it is over with now. Q. Do you want to pull your chair back a little bit? A. (Witness does as requested.) Q. Will you take your right leg and cross it over your left? A. I don't know what you ask me to do that for. Q. Will you cross your right leg over your left? A. (Witness does as requested.) Q. All right, now put it down again.

Now put the left leg over. A. All right, I will tell you. I had infantile paralysis. I have got two brothers home that got it, too. Q. Is that why you can't use your leg? A. Yes sir. (Witness breaks down and weeps.) But that ain't got no bearing on this case. I have got a license, don't forget. Q. Did you report to the Motor Vehicle Bureau at the time you made your application for a license, you had this trouble with your leg? A. Yes, they knew it. I passed the test. Q. Did you tell them about this condition? A. They knew it, yes. Q. Who did you tell? A. I don't know the inspector's name. Q. Did you tell the inspector about it? A. He didn't know it, but they are State inspectors. Q. That is not the question. You didn't tell the inspector about it when you got your license? A. No. Q. Did you put it on your application that you had incomplete mobility of your legs? A. At that time I didn't have it. Q. Did you report it to them when you had the infantile? A. No, I had my license already. Q. You didn't report to the Motor Vehicle Bureau that you had a physical disability? A. I didn't have it at that time. Q. When you got it, you didn't report it? A. I didn't think you had to. Q. You continued to drive a car, even though you knew you couldn't use your leg? A. I can use it. Q. Isn't that right leg the one you use? A. Yes. Q. Isn't that the reason you didn't put your brakes on that night? A. No sir. Q. It is not the reason? A. No sir. Q. You can take that leg and put the brake on as fast as a normal individual can? A. Maybe I can't but — Q. I asked you if you can put the brake on and off as fast as a normal individual can? A. Maybe I can't. Q. Why didn't you tell me about this? You had to let me catch you doing it first. A. I didn't think it had any bearing on the case. Q. That is not for you to determine. You are supposed to answer the questions, isn't that right? A. Yes. Q. And you tried to withhold that from this Jury, isn't that the truth? A. No. You would have found it out, anyway. Q. You hoped I wouldn't ask you that? A. Yes sir. Q. And you withheld that from this Jury, didn't you? A. No, I didn't, but you would have found out. If I couldn't do it, you would have found out.''

'' By Grand Jurors: Q. Have you had your license renewed? A. Yes sir. Q. And you have had your sickness in between those times? A. Yes sir. Q. When did you have infantile paralysis? A. About three years ago. Q. How old are you now? A. Twenty-two. Q. Three years ago you had infantile paralysis and you had a chauffeur's license previous to that time? A. Yes sir. Q. How long did you have a chauffeur's license before you had

infantile paralysis? A. I got my chauffeur's license when I was 17. Q. Did you have that infantile paralysis at the time you had that other accident? A. Yes sir, but I mean I had it — I haven't got it any more, but I still got some of the effects; I ain't really regular strong like anybody else is — as far as my body is concerned, I am all right; it is just there.''

The testimony given by the defendant as to his physical condition must have influenced the Grand Jury to return a true bill, in view of the other testimony. There isn't any other testimony regarding defendant's physical condition, except that of the defendant, and the defendant says he can use his leg but may not be able to put it on the brake as fast as a normal individual.

The section of the Penal Law [§ 1053-a] under which the defendant was indicted in Criminal Negligence, passed by the Legislature in 1936 (L. 1936, ch. 733) and went into effect September 1st of that year. This section applied only to operation of a motor vehicle resulting in death, and contains the words '' reckless or culpably negligent manner ''. Before 1936 a person charged with negligently killing another was prosecuted under the second degree manslaughter section, and if convicted, was subject to imprisonment not exceeding fifteen years or by fine of $1,000, or both. The District Attorneys' Association proposed the present law, being convinced that the punishment for involuntary homicide was too severe, and that manslaughter did not correctly describe the crime. The present law, although the language differs somewhat from the manslaughter section, does not change the degree of proof required to convict one of reckless or culpable negligence. Many definitions have been given as to what constitutes culpable negligence but the following has been approved on numerous occasions by our highest court. '' The word ' reckless ' and the phrase ' culpably negligent manner,' as employed in the penal statute quoted above connote something more than the slight negligence necessary to support a civil action for damages. Both word and phrase import a disregard by the accused of the consequences of his act — an indifference to the rights of others.'' (*People* v. *Bearden*, 290 N. Y. 478, 482.)

They '' ' must not only find that the evidence establishes, before they can convict, the presence of mere ordinary negligence on the part of the defendant, but they must find it in such extreme degree as the use of the term ' culpable negligence ' imports in the section of the Code referred to.' ''

(*People* v. *Buddensieck,* 4 N. Y. Crim. Rep. 230, 266, affd. 103 N. Y. 487.)

The leading case on culpable negligence in this State is *People* v. *Angelo* (246 N. Y. 451). Judge ANDREWS, writing for the majority, gives a number of definitions of culpable negligence and refers to the case of *People* v. *Buddensieck* (103 N. Y. 487, *supra*) as the leading case in this State on the subject and approves the language of the court in charging the jury in that case, " ' they must not only find that the evidence establishes, before they can convict, the presence of mere ordinary negligence on the part of the defendant, but they must find it in such extreme degree as the use of the term ' culpable negligence ' imports in the section of the Code referred to.' " And again he uses the words " unlawful negligence " or " reckless means ". Judge ANDREWS continues (p. 457): " ' Culpable negligence ' is therefore something more than the slight negligence necessary to support a civil action for damages. It means, disregard of the consequences which may ensue from the act, and indifference to the rights of others."

Ordinarily, whether a given state of facts constitutes culpable negligence is one for the jury. But it may become one of law for the court.

In the case at bar, the defendant while driving a taxicab along a road, on a clear night, had the misfortune to be suddenly come upon by a woman walking or running across the street. One with better reflexes might have avoided the accident. One who had expert judgment or a more expert driver might have avoided the woman. Speculating on what might have happened better illustrates the degree of proof required to convict; the wanton, reckless disregard of the rights of others to warrant criminal punishment is lacking.

It follows, therefore, that the indictment must be dismissed.