THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* RICHARD J. DAWSON, Defendant.

Supreme Court, Special Term, Jefferson County, April 23, 1954.

*Reginald P. Bigness* for defendant.

*Sanford N. Egloff, District Attorney of Lewis County,* for plaintiff.

HUDSON, J. The defendant herein, Richard J. Dawson, moves for a dismissal of the indictment which charges him with the crime of "Criminal Negligence while engaged in hunting, resulting in the death of another," as defined in section 1053-c of the Penal Law of the State of New York.

The indictment charges: "That said Richard J. Dawson, near Brantingham Lake, in the Town of Greig, and County of Lewis, aforesaid, on or about the 1st day of December, 1953, at about 12:30 o'clock in the afternoon of that day, while engaged in hunting, did discharge a firearm, to wit: a 30-06 rifle, in a wrongful, unlawful, reckless and culpably negligent manner so as to cause a bullet shot by him from said rifle to enter the body of Thomas Peckham, a human being, by reason of which the said Thomas Peckham was then and there mortally wounded and did die from said wounds, contrary to the form of the statute in such case made and provided, and against the peace of the People of the State of New York and their dignity."

The only direct evidence before the Grand Jury as to the manner in which the alleged crime occurred was that of the defendant himself, who waived his immunity and testified before the Grand Jury, and the testimony of the State trooper, who arrived at the scene of the shooting over a half hour after it occurred and there was advised by the defendant how the shooting occurred in the following language: "that they had left Black River at approximately 8:00 of that morning in the deceased's car, proceeded to Brantingham Lake to the Stoddard camp, arriving there about ten o'clock; that they entered the camp with permission of the owner, made a fire in the stove, banked it off and left the camp at eleven o'clock to hunt for deer. They crossed the Dolgeville Road at a point approximately five miles North of the Pine Tree Tavern at Brantingham Lake and still-hunted Easterly from the road, Dawson

walking in an Easterly direction with the deceased, Mr. Peckham, on the right hand side or to the South. That they were walking at a distance sometimes in sight of each other, sometimes out of sight of each other; the only sounds they made were whistling back and forth to keep in contact, one with the other. That they saw no deer until approximately 12:30 P. M. Shortly after 12:00 Mr. Dawson whistled for Mr. Peckham, the deceased, and received no answer. He figures shortly before 12:30 he whistled again and received no answer. A few minutes later, approximately 12:30, looking Easterly, believing Mr. Peckham to be on his right, not knowing whether he was or not, he distinctly saw a deer, a good size deer; he couldn't see any horns on it; he thought he saw, just ahead of this deer, the tail of another deer — he wasn't sure about that. This one deer he saw and the one he thought he saw, were running from the North toward the South. He took a bead on the deer and fired once. Just as soon as he fired he heard a man holler, ' help, help, I've been shot '. He ran over to where the hollering came from and found Mr. Peckham, his partner, lying on his back with his left leg doubled up under him.''

The defendant's testimony as to what happened was as follows: '' We were still-hunting. He was off to my right and we just kept just in sight, once in a while out of sight; either he or I would whistle and come back in closer together, but he stayed right on my right. Then, I guess it must have been quarter after twelve, I whistled and I didn't get any answer, so I kept hunting. I figured that if he wanted to find me or was whistling to me too, he could come back over. I kept on still-hunting. I got on this ridge so I could see all around me; I have tried to hunt on the ridges and I whistled again; I don't know what time it was, it was about three or four minutes before it happened. I knew that he had hunted before, but I knew he wasn't familiar with that territory; I didn't want him to get lost; I tried to explain the directions and everything; I didn't get any answer; about three minutes after that I was going along top of the ridge; I jumped two deer on my left, they crossed over in front of me going toward the right and away from me; the first one I couldn't see very well; the second one was fairly clear; I pulled up on it and followed him along and I shot, and he yelled, ' help ' a couple times; he said ' I'm shot '. Somehow I knew it wasn't him because I knew he couldn't have been in there. but I ran over there and it was him.''

The defendant further testified:

" Q. You couldn't see any horns on any deer? A. All I knew it was a big deer, something about the way he ran; he was so big and the other deer — I always heard a buck travels behind a doe. In my mind, I know it was a buck.

" Q. For how far had you seen this deer when you shot? A. I think it was about 100 yards — I seen it for about 20, 30 yards.

" Q. Were you standing when you shot? A. Yes, I was standing.

" Q. Do you wear glasses at anytime? A. No, my eyes are perfect."

The State trooper testified that he stationed his companion where the dead man was found and himself stood at the spot where the defendant claimed to have fired and that the underbrush was so dense that he could only see his companion by bending low and then could only see his legs. The defendant was twenty-two years of age. He was a Korean War veteran, had experience in using firearms. His hunting companion was twenty-three years of age, a good friend of the defendant and the husband of defendant's cousin.

The evidence before the Grand Jury discloses that the defendant rendered what assistance he could to the wounded man and then left to get help and assistance. Later he returned to the scene of the shooting and remained there until the arrival of the doctor and the State troopers. The medical testimony indicates that the deceased met his death from a bullet wound which ruptured the aorta and which, the doctor testified, would lead to death within a very short time, possibly less than one minute.

Section 1053-c of the Penal Law is a new section which became effective July 1, 1953. It is almost identical in wording with section 1053-a, which became a law on September 1, 1936, and which creates the same criminal liability in relation to the operation of motor vehicles as section 1053-c creates in the case of death by shooting while engaged in hunting. Both of these sections impose a similar criminal liability, but with a less serious penalty, than that which formerly covered similar crimes under section 1052 (subd. 3) of the Penal Law, being manslaughter in the second degree. Liability under all of these sections of the Penal Law is based upon the existence of " culpable negligence or recklessness ". It is the contention of the People in this case that section 1053-c was enacted by the Legislature to curb hunting accidents and that the expression, " cul-

pable negligence and recklessness '' has a broader meaning than when used in section 1053-a or section 1052. There is no report of ·the Law Revision Commission relating to the passage of section 1053-c but the report of that commission for the year 1937 contains an extensive history of the development of the laws of this State relating to homicide and in particular the second degree manslaughter section 1052. It is there pointed out that there had recently been a suggested new section to be known as manslaughter in the fourth degree, which would involve an act '' performed without ordinary care and precaution '', resulting in death (p. 764). This section was never enacted by the Legislature and it was pointed out in the Law Revision Commission's Report that the Legislature evidently did not intend to reduce the obligation below that of '' culpable negligence ''. The Legislature adopted section 1053-c later and continued to limit liability to that of '' culpable negligence or recklessness ''. Had the Legislature intended to change the liability from culpable negligence or to reduce the amount of the negligence necessary to constitute criminal liability it could have worded section 1053-c to do so. I am, therefore, of the opinion that the same rule as to the meaning of culpable negligence or recklessness should be applied to section 1053-c as should be applied to the wording of section 1053-a or subdivision 3 of section 1052.

The term '' culpable negligence '' has been defined by the Court of Appeals in the following language: '' ' Culpable ' negligence is therefore something more than the slight negligence necessary to support a civil action for damages. It means, disregard of the consequences which may ensue from the act, and indifference to the rights of others. No clearer definition, applicable to the hundreds of varying circumstances that may arise, can be given. Under a given state of facts, whether negligence is culpable is a question of judgment. Ordinarily for the judgment of the jury, as is the question whether negligence exists at all. But in the one case as in the other it may become a question of law. If the negligence is so slight as not to reach the required standard the court should advise an acquittal of the accused. Under such circumstances the jury may not be allowed to find a verdict of guilty.'' (*People* v. *Angelo,* 246 N. Y. 451, 457–458.)

In this case it is interesting to note that the court reviews the history of the laws both in England and this country relating to murder and manslaughter and comments on the failure of the Legislature to adopt the proposed manslaughter in the

fourth degree based on a failure to use ordinary care and precaution. In this connection the court stated at page 456: "Evidently the Legislature was not satisfied with this definition. Its intent was to soften existing rules, not to make them more rigorous. It contained eminent lawyers well instructed as to the common law. It, therefore, struck out this clause. There remained the provision as to killing by 'culpable negligence' practically in the same form as it has existed ever since. It would seem clear, therefore, that the Legislature used the word in the same sense as it had been used for centuries — as the equivalent of 'criminal,' 'reckless,' 'gross,' such negligence as it is worthy of punishment."

In *People* v. *Carlson* (176 Misc. 230, 232), Judge LEIBOWITZ, in dismissing an indictment and following *People* v. *Angelo,* states: "Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, do not constitute culpable negligence. There must exist in the mind of the accused at the time of the act or omission, a consciousness of the probable consequences of the act, and a wanton disregard of them."

In *People* v. *Joyce* (192 Misc. 107) the court dismissed an indictment for manslaughter in the second degree under section 1052 (subd. 3) involving a hunting accident. The facts and circumstances are quite similar although, in my opinion, the facts indicate a greater degree of negligence than in the present case, as in the *Joyce* case the evidence indicated that the defendant fired at the deceased although taking him to be a deer. The court followed *People* v. *Angelo* (*supra*), *People* v. *Carlson* (*supra*) and *People* v. *Wells* (186 Misc. 979). *People* v. *Wells* (*supra*) contains a very thorough discussion of the meaning of the term "culpable negligence". At page 981, the court stated: "Culpable negligence has been defined as something more than the slight negligence necessary to support a civil action for damages." The court then cited many leading authorities which define "culpable negligence". *People* v. *Wells* involved a hunting accident in which the defendant fired at an object he took to be a fox but which turned out to be a human being and under circumstances which would, if anything, indicate a greater degree of negligence than in the present case, the court dismissed the indictment. At page 983, Judge RYAN stated: "The position of the People upon this motion, that the question of whether or not the acts of the defendant were culpably negligent constitute a question of fact solely for the jury, is not tenable." Citing *People* v. *Angelo* (*supra*).

The only case which has been called to my attention under which section 1053-c has been considered is an opinion of Honorable MILLER F. MORAN, County Judge of Lewis County, in *People v. Smaka* (206 Misc. 295). In that case, the court stated: " In his brief of the law, the defendant has cited several cases involving firearms. Generally, I believe we can say that ' reckless ' and ' culpably negligent ' mean the same whether applied to a vehicle or a firearm; however, to the writer there is a great difference between an automobile and a high-power rifle; it is true, one may be as dangerous as the other; but a firearm is a dangerous weapon, it is a weapon for killing; in the instant case the defendant was carrying this weapon to kill, if seen, a wild animal; whether hunting for a deer or a bear, he was bound under the law to kill only a certain sex or age; to determine it was necessary to see, and distinguish, what he shot at; that requires more than aiming and firing a heavy firearm at a moving object. The determination of the acts of the defendant, whether reckless or culpably negligent, under the circumstances of this case are questions of fact for a jury's determination. (*People v. Williams,* 187 Misc. 299.) " In the *Smaka* case, case, which involved a hunting accident, also in Lewis County in 1953, the defendant in firing at what he took to be a black bear, shot and killed one of his own hunting party. In that case he intentionally fired at an object which later turned out to be a human being. This is considerably different than in the present case where the defendant testified that he fired at a deer which he had distinctly seen and in so doing struck and killed his hunting companion whom he had not seen and did not know was there. It may well be as Judge MORAN has stated in *People v. Smaka,* that there is a great difference between an automobile and a high-powered rifle but the rule which has been applied by the Legislature in fixing criminal liability is the same for the driver of an automobile and a hunter, namely, that he must be guilty of culpable negligence or recklessness. There must be some evidence that the acts of the defendant were culpably negligent or reckless before there can be a question of fact for a jury to determine.

I am, therefore, constrained to hold that as a matter of law the evidence adduced before the Grand Jury does not establish beyond a reasonable doubt that the defendant was guilty of that degree of negligence which may be termed " culpable negligence " rendering him criminally liable under section 1053-c. The indictment should be dismissed.

Submit order.