George R. Davis, J.
On a Saturday morning, March 2, 1963, the respondent, Andrew Bogart, then 14 years of age, and a 9th grade student at West Hill Central School in the Town of Geddes, Onondaga County, and a friend, Richard Brooks, then *1076 15 years old, left their homes to go hunting for crows and rabbits in the general vicinity of an area known as Pegg’s Woods, which was near the school. The boys had one weapon between them, a 16-gauge Mossberg shotgun with a bolt action. The gun was fed by means of a clip which held two shells and a third shell could be placed in the chamber. The weapon was equipped with a safety device, but the bolt could not be moved or pulled to the rear to remove the cartridge in the chamber unless the safety was in the off position. The shotgun had been owned by the respondent’s grandfather who lived with him.
The respondent had taken the Hunter Safety Training Program, received his certificate, and lawfully held a hunting license. He was not accompanied by an adult on this hunting expedition as required by subdivision 9-a of section 180 (now | 238) of the Conservation Law.
Pegg’s Woods are southerly from Onondaga Boulevard, a highway which runs generally parallel, to Grand Avenue in the Town of Geddes. West Hill School lies between Grand Avenue and Onondaga Boulevard with the school building itself about 500 yards southerly from Grand Avenue. • Grand Avenue runs generally east and west and intersects with Pay Avenue at a point about four tenths of a mile easterly from a driveway leading from Grand Avenue to the school parking lot.
At a point near the intersection of the school driveway and Grand Avenue, the locality is generally undeveloped and there are areas northerly of Grand Avenue for about a half a mile where the terrain is unoccupied and is lightly wooded. Westerly of this point and towards Pay Avenue houses have been built along the highways; but as one proceeds easterly along Grand Avenue, the area is relatively uninhabited.
The respondent and his friend, Richard, walked about Pegg’s Woods until early afternoon and each of the boys had shot the gun at'least once. As they left the woods to head for home, they went across Onondaga Boulevard. At this'time' the gun. was passed back and forth and there was.some talk of unloading the weapon. The testimony is not clear as to which boy had the responsibility or should have unloaded the gun as Andrew and Richard crossed Onondaga Boulevard; but in any event as it turned out, neither boy did remove the shells from the gun at that time.
The respondent and his friend after crossing Onondaga Boulevard went through the school property and walked northerly up the driveway leading to West Hill School until they reached Grand Avenue at a point near the intersection.of the driveway and a pump house which is shown in Exhibit Two.
*1077 While the respondent and Richard wore in the schoolyard, they had seen two other boys, one named Ralph Meyers and the other James O’Brien. All of the boys knew each other from school; as between the respondent and Richard and Ralph and James this was the extent of their acquaintance. There is no proof of any ill will, malice, jealousy, or the like between any of the boys. There is no proof that the boys at that time or thereafter engaged in any roughhouse or horseplay or that this meeting was anything other than chance.
The respondent and Richard walked across Grand Avenue and Richard decided to climb a bank about seven feet high and go out in the open field northerly of Grand Avenue to look for muskrat tracks. 'The respondent testified that he walked about a couple of feet off the shoulder of the highway and realized that the gun was either loaded or he was checking it to see whether or not it was loaded and was working the bolt when very shortly a tragic incident occurred.
The respondent, Richard and Ralph all agree that while Ralph and James were at a point in the center of the highway, James yelled, ‘1 Hey, Andrew ” or “Hey, Bogart,” and that the respondent, who was facing away from the road, turned around, the gun went off, and immediately James fell to the pavement mortally wounded.
Ralph placed James and himself about 75 feet away from the respondent and testified to the effect that as the respondent turned around immediately after the call to him by James, the gun was at or near his shoulder and it went off, that immediately the respondent dropped the gun to the ground, threw down his jacket and ran over to the wounded James. James was carried to the side of the road and was found dead upon the arrival of the police authorities.
The Brooks boy testified that he climbed an embankment about 7 feet high and was about 50 feet from Jim and 65 feet from the road and that he heard James yell to Andrew and that he saw Andrew turn around with the gun at his shoulder and that it went off and that Andrew immediately threw the gun down and that they ran to help the O ’Brien boy and then immediately went to a nearby house to call an ambulance.
A measure of difficulty came about on the hearing as it became apparent from the testimony of the State Police who investigated this occurrence at the scene, that the Brooks boy had then told them a different version from that subsequently related. Brooks told the police at the scene that he did not actually see the shooting but heard a shot and turned and saw the O’Brien boy slump to the pavement. This evidence was admitted for *1078 impeachment purposes and has no independent probative value, but I am satisfied that Bichard Brooks saw the whole event and the version of the occurrence given by him and the various other witnesses on the hearing was true. Furthermore, it developed that Bichard and the respondent may have had some talk just before they called for the ambulance to the effect that Bichard not admit to seeing the whole event — not say that he saw the respondent point the gun at the deceased — so that it might go easier or look better for his friend, Andrew.
When the State Police arrived they found a hunting jacket in the snow close by the shotgun, an expended shotgun shell, and a clip containing a live round, and the bolt of the gun. There was nothing in the chamber of the shotgun. These objects are shown in Exhibit One and the jacket can be seen in the background in photograph Exhibit Two. Apparently no one had touched these objects since they were dropped by the respondent and it is clear to me that either the respondent was in the act of unloading the shotgun when he turned towards the O’Brien boy, had the gun in his hands in the vicinity of his shoulder and his finger applied sufficient pressure on the trigger that the gun fired directly at the deceased, or he did not know the gun was loaded and when he turned in response to the hail from James he applied pressure on the trigger and it fired with fatal consequences.
Also investigating were the Onondaga County Coroner and an Assistant District Attorney.
In due time a petition was filed in the Family Court alleging that the respondent was a juvenile delinquent in that he violated subdivision 9-a of section 180 of the Conservation Law relating to hunting and being accompanied by an adult which if true and done by an adult would constitute a misdemeanor. To this petition the respondent, being represented by an attorney, and before the court, admitted the truth, was adjudicated a juvenile delinquent, and put on probation.
■Subsequently (the instant proceeding) a petition upon information and belief was filed by the mother of the dead boy, Mrs. O’Brien, alleging that the respondent should be adjudicated a juvenile delinquent iby reason of criminal negligence while engaged in hunting resulting in the death of another (Penal Law, § 1053-c), acts which if done by an adult, would constitute a crime and, as to this charge, a felony.
While the dead boy’s mother is undoubtedly a proper petitioner (Family Ct. Act, § 733), one wonders why she would insist upon bringing this proceeding. Perhaps she concluded that the punishment was not severe enough on the first proceeding; that *1079 retributive justice was not done. If so, then the petitioner has my sincere understanding, but she must be told that this is not the approach of the Family Court nor is it the philosophy of our law to consider the goal of juvenile proceedings to find guilt and affix punishment. ‘ ‘ The State was not seeking to punish a malefactor. It was seeking to salvage a boy who was in danger of becoming one.” (People v. Lewis, 260 N. Y. 171,177.)
One wonders, should I find the respondent chargeable, what good would be accomplished. He has already been declared to be a juvenile delinquent. He is on probation. All that I might do in such event is to make a different disposition. This would be unlikely unless a second probation report would disclose factors unknown at the time of the first report which would cause placement or confinement.. It would not ordinarily be appropriate for another Family Court Judge to sit in review of the first court’s disposition.
If the petitioner felt that justice was not done on the first proceeding, could she have intervened and taken an appeal? If it be a question only of the correctness of the disposition or what is to be done with Andrew, then I feel that the instant petition was, perhaps, ill-advised; especially so after hearing the evidence and the character witness brought on by and on behalf of the respondent. But then, the petitioner cannot be expected to know all of the facts which were brought out on the instant hearing. Quite possible she had been led to believe that the respondent was an evil person, malevolent, and dangerous; her grief has been overwhelming. But should the petitioner be allowed to follow a course of action which will twice require the Bogart boy to become a respondent to twice require a court to go over essentially the same ground — should the respondent be declared a juvenile delinquent; does he require supervision, treatment or confinement? It has already been determined that Andrew is delinquent and needs supervision.
At the onset of the hearing the respondent’s attorney made a motion to dismiss the petition upon the grounds of former jeopardy, arguing that in every case under the article 7 of the Family Court Act “Proceedings Concerning Juvenile Delinquency ’ ’, the ultimate finding of fact is whether or not the respondent is a juvenile delinquent and inasmuch as this respondent had previously been so adjudicated, the instant proceeding was barred. On this motion I reserved decision and under the view I take of the whole case it is now not necessary to decide this question although it would seem that because the proceeding is essentially civil in nature, although partly criminal in form (Hodson v. Hoff, 266 App. Div. 228, affd. 291 N. Y. 518) *1080 or perhaps “ quasi criminal ” in character (Matter of Ronny, 40 Misc 2d 194), the constitutional protection against double jeopardy would not apply even if there was an identity of parties and issues, which in this case there was not. For the same reason the doctrine of collateral estoppel does not apply nor is the proceeding barred by the theory of res judicata. (Matter of Smith, 114 N. Y. S. 2d 673; People v. De Sisto, 27 Misc 2d 217, revd. sub nom. People v. Lo Cicero, 17 A D 2d 31; United States v. Rangel-Perez, 179 F. Supp. 619; People v. Roderman, 34 Misc 2d 497; Israel v. Wood Dolson Co., 1 N Y 2d 116.)
The respondent also moved to dismiss the petition upon the grounds of insufficiency in that it was upon information and belief and not supported by any affidavits. This motion was denied. I do not believe the petition should be considered as an information under section 145 et seq. of the Criminal Code or that the law set forth in People v. Bertram (302 N. Y. 526) applies, at least when the petition, as in this case, serves as a pleading and not as the basis for an issuance of a warrant. (See, also, Matter of “ Jones ” v. Rochester S.P.C.C., 206 Misc. 557.)
Inasmuch as the petitioner’s proof indicated that the hunting expedition was at an end and the boys were returning to their homes, question might be raised as to the applicability of section 1053-c of the Penal Law, “ Criminal negligence while engaged in hunting resulting in the death of another ” and whether the specification is proper under the instant state of facts. (Emphasis added.) It could be argued that there was no proof that the respondent at the time and place in question was hunting. The occurence can be comparable to that of discharge of a weapon while it was being cleaned or examined at home after or before a hunting trip or the discharge of a weapon in a car or enroute to the hunting area. The reported cases which have come up under section 1053-c all arose under factual circumstances clearly showing that the hunt was on. On the other hand there were open and slightly wooded areas contiguous to the scene of the shooting and it seems probable that if Richard had seen game in this vicinity, northerly of the point of the shooting, the boys would have continued their hunting and had there been an adult with them would have been lawfully conducting themselves. Be that as it may, was there a sufficient showing of culpable negligence or reckless conduct on the part of the respondent to find him chargeable %
While the concept of criminal negligence must be difficult for many persons to understand, the courts of this State on various occasions have defined the term and given us yardsticks which
*1081 must be followed to measure that conduct alleged to be criminally negligent. The cases under section 1053-c of the Penal Law are reported in People v. Smaka (206 Misc. 295); in People v. Dawson (206 Misc. 297) and in People v. Swygert (21 Misc 2d 285). To convict under 1053-c the finders of the fact must find that the defendant had a disregard of the consequences which might ensue; an indifference to the rights of others; a devil-may-care attitude is of significance. ‘ ‘ Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be, do not constitute culpable negligence. There must exist in the mind of the accused at the time of the act or omission, a consciousness of the probable consequences of the act, and a wanton disregard of them.” (People v. Carleson, 176 Misc. 230, 232.) Applying the rules of daw above mentioned and the direction found in People v. Joyce (192 Misc. 107); Brown v. Shyne (242 N. Y. 176) and People v. Angelo (246 N. Y. 451), I am unable to find that Andrew Bogart has in fact at the time and place in question acted-in a fashion that, if he were an adult, would direct the finders of fact to a determination that he was criminally negligent.
At the conclusion of the petitioner’s case and on the conclusion of the whole case the respondent’s counsel moved to dismiss upon the grounds that the petition had not been established beyond a reasonable doubt. I was prompt to remind counsel that under section 744 of the Family Court Act the requirement was not reasonable doubt, but a preponderance of the evidence, and it is under the Family Court Act that I now find and conclude that the petition should be dismissed.