Peter T. Farrell, J.
Upon these motions for orders dismissing an indictment accusing them of arson, first degree, defendants contend that their prosecution therefor is barred by the principles of former jeopardy and res judicata[1], brought into operation through their prior acquittal of felony murder after trial upon an indictment based on the identical criminal act charged in the arson indictment. Since the facts are not in dispute there are but issues of law, to be resolved by the court (People v. Smith, 172 N. Y. 210, 226; People ex rel. Kammerer v. Brophy, 255 App. Div. 821, 822, affd. 280 N. Y. 618; see, also, Emich Motors Corp. v. General Motors Corp., 340 U. S. 558, 569).
Accordingly, I hold: (1) that the pleas of former acquittal cannot be sustained and the motions to dismiss on that ground are, accordingly, denied; (2) that the prosecution under the arson indictment is not forbidden by the provisions of section 1938 of the Penal Law but (3) that it is precluded by the principle of collateral estoppel and the motions to dismiss on that ground are, therefore, granted. An outline of the facts will put the issues of law in perspective.[2]
*499 Oil the -early morning of April 4, 1959 a fire started in the men’s lavatory of a first-story bar and grill in the Grassy Point Hotel, in or near the Rockaway section of Queens County. Among the then occupant's of the building there was a man abed in a second-floor room and the evidence leaves no question but that the fire caused his death. Not long before its occurrence the defendants had been in the place, their barroom antics had been suppressed by the bartender and, after visiting the lavatory, they had left. Shortly after their departure the fire was discovered and in the course of the resultant investigation, they were questioned by the authorities.
Based upon statements allegedly taken from the defendants on that occasion, the theory of their later murder-prosecution was, that while in the lavatory they had noticed a mop standing upside down, in a utility compartment; that at Dowd’s request Roderman handed him a book of matches, one of which Dowd lit and put to the mop until it started to smolder and that both men then returned to the barroom, gathered up a male companion and left the building. Also developed by their alleged statements was a course of after-conduct which, depending upon their original intent, might either have evinced defendants’ consciousness of guilt, or the impact of their realization that a prank had gone far beyond anything intended in its commission.[3] At any rate, a Grand Jury eventually handed up the two indictments that have given rise to the issues involved.
One was the murder indictment upon which defendants have been tried and acquitted. In each of three counts it accused them of murder, first degree, in that they had caused the death of a named victim by their perpetration of the crime of arson, their commission of the latter crime being alleged in substantially the language of the pertinent arson statutes. By pleading in the alternative, the respective counts were so framed as to *500 meet any eventualities of proof as to the nature of the building, the time when set afire, the fact of human occupancy and defendants’ knowledge thereof. The other indictment is the target of the present motion to dismiss. In each of two counts it charges arson, first degree, committed on the same date, affecting the same structure and likewise pleads the circumstances of commission in the alternative.[4] Holding the arson indictment in reserve, the District Attorney put defendants to trial for the felony-murder and, following the defeat of that prosecution — by a complete acquittal — moved for their trial on the arson charge. His motion was countered, in turn, by the applications now before the court and the records produced and considered on their disposition leave no doubt of the grounding of both prosecutions upon the same conduct. But the constitutional safeguard against repeated jeopardy (N. Y. Const., art. I, § 6; U. S. Const., 5th Arndt.) “ is designed to protect the citizen from vexations and successive prosecutions for the same offense ” and when the former jeopardy plea is interposed ‘‘ this danger must form its foundation if it is to be sustained ’ ’ (People v. Ercole, 4 N Y 2d 617, 621). The defeat of the plea in the instant case is dictated by respect for controlling precedents under whose authority it must be held that the offenses are not the same.
The cases just referred to maintain that in a felony-murder case the murder and the collateral felony are substantively and genetically different offenses and that the underlying felony is not an element of nor “necessarily included” in the murder. In the aggregate of the foundation for the decisions are a common-law fiction and a procedural device conceived and employed, in the latter and more temperate course of the common law, to protect the accused from prejudice. The fiction is said to supply the “malice aforethought” — regarded as essential to guilt of murder in the first degree — through transference, by implication of law, of the ‘ ‘ malicious and premeditated intent” to perpetrate the underlying felony (People v. Enoch, 13 Wend. 159, 174[5]; see, also, inter alia, People v. Wood, *501 8 N Y 2d 48, 51). The status of the latter crime as “an independent offense ” and not “ an ingredient of the murder” is confirmed by the common-law device, which tested a defendant’s susceptibility to accusation of both crimes in one indictment or to conviction, by surprise, of a crime not fairly included in that charged by a single count. Thus, upon an indictment for murder, a conviction of the felony could not be had. “ Two felonies arose out of the prisoner’s acts — neither being dependent on or an ingredient of the other; and for either or both he might have been indicted. But an indictment embracing both felonies would have been bad. * * * The rule was the same at the common law ” (Buel v. People, 18 Hun 487, 493, 494, affd. 78 N. Y. 492).[6] Apart from the violence causing the death, the elements of the felony must be “so distinct * * * as not to be an ingredient of the homicide, indictable therewith or convictable thereunder.” (People v. Huter, 184 N. Y. 237, 244, citing Buel v. People, 18 Hun 487, 493, affd. 78 N. Y. 492, supra.) *502 Nor is the felony “ necessarily included ” in the homicide within the meaning of the applicable (permissible-verdict) statute (Code Grim. Pro. § 445) the crimes being “ substantively and generically separate and distinct offenses ” (People v. Nichols, 230 N. Y. 221, 225-226). Upon a trial for the murder then, the accused is not deemed to have been put in jeopardy of conviction of the collateral felony (People ex rel. Santangelo v. Tutuska, 19 Misc 2d 308, 313[7], affd. 11 A D 2d 906) notwithstanding legitimate bases in the evidence (People v. Mussenden, 308 N. Y. 558, 563) for findings that while all of a number of criminal actors were guilty of the felony, the supposedly fatal violence was not shown to have been the cause of the death (Code Crim. Pro., § 444) and in any event, only one of the felons was concerned, as principal (Penal Law, § 2), in the assault designed to kill the felony victim (People ex rel. Di Lapo v. Tutuska, 27 Misc 2d 544, affd. 11 A D 2d 906, affd. 9 N Y 2d 910, upon the opinion at Special Term), the actual assáilant’s violence being only “ incidentally coincident with the felony” and not in its furtherance (People v. Wood, 8 N Y 2d 48, 51, supra). It may also be, that a murder defendant is not deemed to have been in danger of conviction of the felony where his counsel, at the trial, renounces any right to have the jury consider the client’s guilt of the lesser, predicate crime (People ex rel. Di Lapo v. Tutuska, 27 Misc 2d 544, 545, 546, supra). However that may be, the other precedents indicate the path of decision that must be followed.
Their restriction of the idea of “ necessarily included ” crimes to those of generic likeness foils the so-called “ lesser included offense exception ’ ’ to the ‘ ‘ same evidence test ’ ’[8] and arrays New York with the jurisdictions denying that jeopardy of conviction of the foundational felony is involved in a prosecution for that type of murder (see, e.g., Southworth v. State, 98 Fla. 1184, 1188-1189; Harris v. State, 193 Ga. 108, 118 and authori *503 ties cited; People v. Andrae, 305 Ill. 530, 535; Centers v. Commonwealth, 318 S. W. 2d 57, 58 [Ky.]; State v. Rodgers, 100 S. C. 77, 82; State v. Barton, 5 Wash. 2d 234, 238, 240; contra, People v. Miccichi, 264 Mich. 581, 583; State v. Cooper, 32 N. J. L. 361, 372, 373, 375; State v. Carlson, 5 Wis. 2d 595, 608-609). By reason of the unintended, fatal consequence, the offenses are thought to he elementally different and, as it is said, the test of jeopardy by successive prosecutions “is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense.” A “ single act ” may violate two statutes but if one ‘ ‘ requires proof of an additional fact which the other does not, an acquittal or conviction under either * * * does not exempt the defendant from prosecution and punishment under the other ” (Morey v. Commonwealth, 108 Mass. 433, 434). In summary, the “act-offense dichotomy ”[9] defeats the plea of former jeopardy. But, apparently, it goes still further.
By equating the defendant’s “act” with a resulting “ offense ”, it tends to limit the statutory shield (Penal Law, § 1938) to the dimensions of the constitutional safeguard. The statute provides that ‘ ‘ an act or omission * * * made criminal and punishable in different ways by different provisions of law, may be punished under any one of those provisions, but not under more than one; and a conviction or acquittal under one bars a prosecution for the same act or omission under any other provision” (emphasis supplied). Seven years after its enactment, it was accepted as barring successive prosecutions for elementally ‘ ‘ separate and distinct ’ ’ offenses arising from the same act (People v. Krank, 110 N. Y. 488, 491-493). But more recently, profession of doubt as to the meaning of the word[10] has elsewhere been compromised by regarding it as *504 synonymous with “ offense ” (State v. Thompson, 241 Minn. 59, 66) and a New York effort at persuasion in a different direction has, apparently, fallen short of success (People v. Savarese, 1 Misc 2d 305, 313, 318). As enunciated, the rule is that “if separate and distinct acts were committed, and * * * they violated more than one section of the Penal Law, punishment for each of them would be proper although they arose out of a single transaction ”. But1 ‘ if there were merely a single inseparable act violative of more than one statute, or * * * an act which of itself violated one statute and was a material element of * * * another, there would have to be a single punishment ” (People ex rel. Maurer v. Jackson, 2 N Y 2d 259, 264). In its context, the statement of the rule offered a possibility that at least 1 ‘ material-element ’ ’ dignity might be given the collateral crime underlying a homicide, even if an unintended death from an assault committed with intent to perpetrate a felony, would exclude the occurrence from the “single inseparable act” — category.[11] The first possibility seems to have been stifled — -and the second confirmed — by the affirmance in the Di Lapo case. Notwithstanding the invitation of defense counsel to lay the collateral crimes out of that case, the Trial Judge undoubtedly followed his own judgment of what should be submitted to the jury (Code Grim. Pro. § 420) upon the law applicable to the permissible views of the evidence *505 (People v. Mussenden, 308 N. Y. 558, 563, supra). The affirmance upon the Special Term opinion implies that the Legislature did not succeed in extending either the letter or spirit of the Constitution’s section 6 of article I very far, if at all (see Ex Parte Lange, 85 U. S. 163), and in that event the defendants in the instant case are necessarily relegated to dependence upon the collateral-estoppel doctrine alone, in their effort to bar the arson prosecution. That their reliance is held to be well placed has been made apparent by the decision on the point, stated at the outset. My conclusion is, that the judgment rendered on the prior verdict of acquittal (in the setting of the prior proceeding, including the trial-rulings and jury instruction) constitutes an adjudication, by negation, of facts essential to defendants’ guilt of both the felony-murder and the arson. It remains to justify the conclusion, by reference to the law and to the records of the prior and present prosecutions (Emich Motors Corp. v. General Motors Corp., 340 U. S. 558, 569, supra); Hinchey v. Sellers, 7 N Y 2d 287, 293; People v. Rodgers, 184 App. Div. 461, 465, affd. 226 N. Y. 671).
The applicability of the collateral-estoppel principle to the criminal law is accepted by the New York courts (People v. Brooklyn & Queens Tr. Corp., 283 N. Y. 484, 496).[12] Based upon the precept ‘ ‘ that a question once tried out should not be relitigated between the same parties or their privies ” (Commissioners of State Ins. Fund v. Low, 3 N. Y. 2d 590, 595) the doctrine is aptly described by one of the writers as “ that aspect of res judicata concerned with the effect of a final judgment on subsequent litigation of a different cause of action involving some of the same issues determined in the initial action ” (Developments in the Law — Res Judicata, 65 Harv. L. Rev. 818, 840 [1952]). Commonly essential to successful invocation of either the collateral-estoppel or the parent-doctrine, are “ an existing final judgment rendered upon the merits by a court of competent jurisdiction ” (Israel v. Wood-Dolson Co., 1 N Y 2d 116, 118, supra) in a prior action between the parties, upon a *506 matter within its jurisdiction and directly determining a question or fact “ distinctly put in issue ” and not merely “ collaterally in question ” (2 Freeman, Judgments [5th ed.], pp. 1321-1322).[13] But whereas the res judicata tenet extends the binding effect of the prior adjudication to 11 points and matters litigated and adjudicated in the first suit or which might have been litigated therein ” (Israel v. Wood-Dolson Co., supra) and forbids their relitigation in a subsequent action upon substantially the same cause, the collateral-estoppel principle intervenes when ‘1 the two causes of action are different, not in form only” and “ [t]he estoppel is limited * * * to the point actually determined ” (Schuylkill Fuel Corp. v. Nieberg Realty Corp., 250 N. Y. 304, 306, 307). As compacted in that field, the general rule is “that where an issue of fact essential to the judgment is actually litigated and determined by a valid final judgment, the determination is conclusive between the parties and their privies ”. More specifically, if the prior adjudication of the issue of fact 11 was a finding essential to the judgment, from which the resolution of the ultimate legal issue necessarily followed ” and thus “ a necessary step in arriving at the final judgment ” it is “ conclusively established between the parties * * * in any later suit ”. If it negates a fact essential to the liability of the party sought to be charged therewith in the second suit, i.e., if “ [t]he resolution of the ultimate legal issue ” in the later action “ also necessarily follows from the * * # factual finding ” the subsequent suit must fail (Hinchey v. Sellers, 7 N Y 2d 287, 293, 296, supra). Within these boundaries, collateral estoppel serves the administration of both the civil and the criminal law (Harris v. State, 193 Ga. 108, 120-121, supra; Commonwealth v. Spivey, 243 Ky. 483, 486-487; State v. Latil, 231 La. 551, 567-568; Commonwealth *507 v. Di Stasio, 297 Mass. 347, 357-368; State v. Barton, 5 Wash. 2d 234, 240) an “ [ajcquittal upon the charge * * * may in proper case constitute an adjudication of an issue of fact or of law necessarily determined by the earlier judgment ” (People v. Brooklyn & Queens Transit Corp., 283 N. Y. 484, 495, supra). As in the civil law, if the prior adjudication belies a fact essential to the defendant’s guilt of the offense charged in the second prosecution, the earlier verdict precludes conviction thereof (Sealfon v. United States, 332 U. S. 575, 578-579, 580) and justifies a summary disposition by dismissal of the indictment (Hinchey v. Sellers, 7 N Y 2d at 289, supra) if the record dependably establishes that the critical fact was adjudicated in the defendant’s favor. It is in the effort to identify the issues previously determined that the most conspicuous difficulty is encountered.[14]
In its pursuit of that objective, the reviewing court may examine the indictments in each case, the evidence submitted, the instructions to the jury, and the opinions, if any, of the previous court (Emich Motors Corp. v. General Motors Corp., 340 U. S. 558, 569, supra; People v. Rodgers, 184 App. Div. 461, 465, affd. 226 N. Y. 671). The reason for a directed verdict may shed light on the matter (Commonwealth v. Di Stasio, 297 Mass. 347, 357-358) and it has been suggested that assistance may he taken from extrinsic evidence (2 Freeman, op. cit., supra, 1455; Jay v. State, 15 Ala. App. 255, 73 So. 137, 138, cert. denied, 198 Ala. App. 691, 73 So. 1000). The content of the indictments in this case has already been outlined. The next inquiry is: What facts were in issue in the felony murder case?
‘1 In issue, ’ ’ in the sense that under the indictment-counts their establishment was essential to the case, but not controverted, were the facts that a fire had occurred, in the nighttime, in a dwelling house (Penal Law, § 220) wherein there were, at the time, human beings {id., § 221, subd. 1) to the knowledge of the defendants {id., subd. 2) and further, that the alleged homicide victim was then one of the occupants of the building and that the fire was the cause of his death. A possible issue of causation was explored by defense counsel in cross-examination of the prosecution’s witnesses, but the effort failed to educe evidence sufficient to make it a submissible issue. All that was developed was that upon discovery of the blaze, some of the occupants *508 unwittingly contributed to its spread by their amateurish attempts to cope with the situation before the fire apparatus arrived.[15] In later instruction keyed to the incident the jury were told, in substance, that a merely contributing cause did not relieve defendants of their responsibility for a criminal act which was the proximate cause of death. 1 ‘ Proximate cause ’ ’ was explained, but no instruction was given in the alternative, that in the event of reasonable doubt as to whether the death resulted from a co-operative, contributing cause or whether it resulted from an independent cause, defendants were entitled to the benefit of the doubt and to an acquittal. On a true causation issue the charge would not have omitted the alternative (People v. Brengard, 265 N. Y. 100, 108). Actually, the instruction was given only to offset the diversionary-temptation of a nonexistent issue for, in the absence of evidence bringing it into the case, there was no obligation to submit it for determination[16] (People v. Mussenden, 308 N. Y. at 562, supra; Ruloff v. People, 45 N. Y. 213, 220; People v. Green, 12 A D 2d 770; Adams v. State, 150 Tex. Cr. 431, 433). No reference was made to the subject in the only request made by the jury, after their retirement. They merely wanted a redefinition of the manslaughter and excuse (“ excusable manslaughter ”) and asked for nothing else. The issues of fact actually contested on the trial were whether the defendants had started the fire at all, and if so, whether designedly or accidentally and, if purposely, whether their intent was to set fire to the building or merely to cause excitement or annoyance.
For the support of its view of these facts, the prosecution relied upon the evidence of the admissions made by defendants in the statements taken after the fire. The District Attorney contended that the admissions established that defendants had deliberately set the mop ablaze and, by inference supported by the attendant circumstances, also proved that they intended thereby to set fire to the building as well, assuming —- without conceding — that intent to fire the building was a necessary element of guilt of the arson. On the other hand, defendants con *509 tended that if they set the mop afire, it was the accidental result of a negligent act. Each took the stand in his own defense and disputed the accuracy of the statements attributed to him by the police and the District Attorney. Each denied that he and his associates intended to set fire to the mop or the building. The version advanced by their testimony was that the match was thrown away after Dowd had lit it to look into the utility closet. Roderman testified, in substance, that the flame went out when the match landed on the mop, although it was still giving off a “little blue smoke.” Dowd testified that after lighting the match so that he could see what was in the closet, he “ aimed and flipped it and it went directly on the mop and I saw it stick on that mop * * * and it just went out, that’s all.” He didn’t know for sure whether the mop was wet or dry (his gratuitous addition that it appeared wet was stricken) but, he insisted, he did not “physically take the match and light the mop.” He denied that when he flipped the match, he intended to set fire to the mop and specifically denied that he intended “ to set fire to the building in any manner at all.” Each defendant disavowed any animosity toward the bartender and the only prior incident of unpleasantry, a week before, did not involve the bartender but rather, a warning from a local, male resident, about supposedly unwelcome attention to the neighborhood girls.[17] At least that was the nub of the testimony except, additionally, that on the eve of the tragedy both Roderman and Dowd had been drinking elsewhere, for some time, before they set out for the Grassy Point Hotel. And that, in substance, was the relevant, evidentiary content of the record when both sides rested.
Upon motions made at the close of the case, the second and third counts of the indictment were dismissed as superfluous, the reason being that in my opinion all three counts charged felony-murder. Defendants’ motion to dismiss the first count was denied with a ruling that the jury would not be permitted to consider the felony-murder but would be instructed to decide defendants’ innocence or guilt of the crimes of manslaughter first and second degrees under that count. However this disposition may be characterized, defendants were thereby acquitted of the felony-murder (People ex rel. Poulos v. McDonnell, 302 N. Y. 89, 91, 92; People ex rel. Bianculli v. McDonnell, 278 App. Div. 782, affd. 308 N. Y. 722; People ex rel. Pulko v. Murphy, 244 App. Div. 382, 384, 385, notwithstanding error, if any, involved in the *510 decision; (People v. Goldfarb, 152 App. Div. 870, 874, affd. 213 N. Y. 664; see, also, United States v. Oppenheimer, 242 U. S. 85, 86, 87; Lee v. State, 26 Ark. 260, 266, 270; State v. Latil, 231 La. 551, 564-570). The trial record does not specifically so indicate, but in the determination thus made I decided:
1. That a positive intent to set fire to the object is an indispensable element of arson in any of its degrees;[18]
2. That the evidence did not rise to the standard of establishing prima facie, and beyond reasonable doubt, that defendants had any intent to fire the building', assuming, as a fact, that they intentionally set the mop afire;
3. But on the latter assumption, defendants’ guilt of a felony was not established since there was no evidence of the value of the personal property intentionally set afire ;
4. Nor was there any support in the evidence for submission of the case as deliberate and premeditated murder, even if allowable under the form of indictment here employed.
Upon an appeal from the order to be made in accordance with this opinion, a higher court may pass upon the correctness of these conclusions. It would, of course, be farcical for the Trial Judge to suggest that a re-examination of his positions on the law should be blocked by the prior adjudication, but the reasoning thought to support the decisions should be laid open to scrutiny.
1. “A conviction for the crime of arson * * * must be based on a willful criminal intention to set fire to the dwelling house * * * (People v. Bates, 271 App. Div. 550, 552, motion for leave to appeal denied, 332 U. S. 789) or other structure or thing declared by our statutes to be an object of arson. Responsibility for the crime, in its several degrees, is limited to a person who “ wilfully burns, or sets on fire ” any of the specified structures and chattels (Penal Law, §§ 221-223) and to one who “ wilfully and maliciously burns or sets on fire any personal property of another person * * * of a value of twenty-five dollars or over, under circumstances not amounting to arson in the first or second degree (id., § 223). By these statutes and others preceding them, the Legislature modified the common law by defining the crime de novo ” (Shepherd v. People, 19 N. Y. *511 537, 540, 541) so as to leave the courts in no doubt “ that the three sections referred to contained the whole law on the subject ” (People v. Fanshawe, 137 N. Y. 68, 75). Even so, while “it was never supposed that the particular intent or motive * * * was a necessary element of the crime ” (id., 73) “ [t]he criminal act was in kindling the fire with the felonious intent to burn the structure ” (Woodford v. People, 62 N. Y. 117, 128).[19] The only present-day relaxation of the intent-requirement occurs where, as a “ manifestly ” foreseeable consequence, the burning of an appurtenance will endanger the main building, or putting fire to the one building will endanger another because of their location with respect to each other. In such case, the person directly firing the appurtenance or contiguous building is deemed to have burned the indirectly-fired building “ as of the moment when the fire from the one communicates to and sets on fire the other ” (Penal Law, § 226; cf., also, § 222, subd. 3).
Fundamentally, “ [t]here is no injustice in holding a person responsible for all the consequences of his guilty act, although they may be more extensive than he intended” (Woodford v. People, 62 N. Y. at 133, supra) but the degrees of his responsibility is proportioned by law to the fairly foreseeable harm. New York has no such provision as was incorporated into English law a century ago (24 & 25 Viet., Ch. 97) (1861) making it a felony to set fire to chattels under such circumstances as that the offense would be a felony if the building were thereby set afire (id., § 7). Yet even there, the courts have held that an intent merely to burn the goods does not justify conviction of the felony. ‘ ‘ There must be an intent, or something, from which an intent may be inferred, to injure the house by burning it ”. Naturally, *512 if the circumstances justify an inference that the personal property was burned as a means toward that end, the consequential firing of the house is a felony (Regina v. Nattrass, 15 Cox C. C. 73, 74; Regina v. Harris, id., 75, 77 [1862]. In that respect, my estimate of the evidence at the conclusion of this case was, and is, that at most, it “ shows a mischievous disposition * * * to destroy the goods and not the house and * * * this offense * * * may and ought to be punished, hut not upon this indictment ” (Regina v. Nattrass, 15 Cox C. C. at 75, supra).
2. The ambitendencies of the evidence of intent held it to “ a mere scintilla ” (People v. Ledwen, 153 N. Y. 10, 18) and as a matter of law, it did not come up to the statutory standard in that it failed to establish prima facie, beyond reasonable doubt, that defendants designedly set fire to the hotel. For that reason, the major crime charged was not submitted to the jury (Code Grim. Pro., §§ 390, 410). “ The presence in the record of some evidence is not sufficient to warrant the submission of a criminal case to the jury ” (People v. Jelke, 1 N Y 2d 321, 335). “ In the exercise of their judicial function, courts have often held than in certain situations as matter of law the evidence must be more than usually clear and convincing. The degree of proof required may he affected by whether the testimony is contradicted by other evidence, whether it is consistent, credible or contains elements of suspicion. Moreover all evidence is to be weighed according to the proof which it was in the power of the party to have produced ” (People v. Oyola, 6 N Y 2d 259, 261).
Apart from their undisputed earlier presence in the place of its outbreak — and a doubtful sort of motivation — the only evidence that defendants started the fire intentionally was in the form of their preindictment admissions. But although it was within the power of the interrogators to do so, they asked no direct questions about the actors’ intent. They probed no deeper than motivation and got acknowledgments that defendants had set the mop afire “ to annoy the bartender ” and “ to make some smoke ”.[20] Whether calculated or inadvertent, the neglect left the proof of intent to depend upon such inference as might be drawn from the act, with proper regard for the other circumstances established by the evidence.
*513 One of those circumstances was that the defendants had spent some time in drinking alcoholic beverages before they set out for the Grassy Point Hotel. Another, was (according to the bartender), that there was no personal quarrel between him and the defendants, whose horseplay he had ended, and a closely related further circumstance was that there was no evidence that defendants harbored any animosity toward the proprietors of the place or any of its other occupants. Still another circumstance was, that a taxi driver (residing in the hotel) heard the sound of laughing and giggling from the open window of the men’s room at or about the time when, according to the other evidence, the defendants must have been engaged in the commission of the act[21] depended on as the source of an inference of deep-seated, ruthless malevolence or utter depravity. And finally, the motivation extracted from the defendants themselves is worthy of such consideration as it deserves against the background of the other evidence in the case (Grattan v. Metropolitan Life Ins. Co., 92 N. Y. 274, 287; People v. Sullivan, 173 N. Y. 122, 131-132; People v. Loomis, 178 N. Y. 400, 405; People v. Leyra, 1 N Y 2d 199, 204-205, fn. 4; People v. Brown, 5 A D 2d 819). Conscious of Justice Cabdozo’s reminder that in appraising criminality by inference “ [o]thcr facts may neutralize it, or repel it, or render it so remote or tenuous or uncertain that in a given case we should reject it” although it might fairly support a conclusion of guilt in a lesser degree than that charged (People v. Galbo, 218 N. Y. 283, 291, 294), I concluded that the fairly permissible reach of inference from the act in this case was limited to a conclusion that defendants intended to set fire to the mop, but not to the building itself (People v. Conroy, 97 N. Y. 62, 75-76; People v. Caruso, 246 N Y. 437, 446). As for their admissions that the defendants, after leaving the place, saw fire apparatus going in the direction of the hotel, turned around, followed the engines, saw the place afire and thereafter took a circuitous route homeward, they bespeak consciousness of responsibility but not, in the light of the other circumstances, to the degree urged by the District Attorney. Inference from that source has its limitations too (People v. Leyra, 1 N Y 2d 199, 209, 210). Consternation created by a realization of the consequences of what turned out to be a disastrous practical joke would have brought anyone in the same situation to fear, as did the defendants, that they were “ in trouble ”, even before they knew that a life had been lost in the fire. Anyone in Roderman’s *514 place would have felt the remorse that he did, for either the co-operation or inaction reflected by his self reproach: “ I could have put it out.” But to view these utterances as bearing out the existence of an original intent to set fire to the building would be to push the inference too far. On the other hand they, together with the other circumstances, clearly support — if not compel — the inference that Dowd, at least, intended to set fire to and thus damage and destroy the mop, and possibly other cleaning accessories in the compartment and that Roderman’s role in the affair was something more than that of an interested spectator. There would, therefore, have been enough proof to indicate guilt of arson in the third degree had there been any evidence that the personal property willfully fired and burned was of a value of more than $25 (Penal Law, § 223).
3. But there was no such evidence and consequently no basis for submission of the case as murder resting on the lowest degree of felony in the arson category (id., §§ 2, 224, subd. 3). For the same reason, the felony grade of malicious mischief {id., § 1433, subd. 1) was also out of the question, although I regarded the act and intent constituents of the conduct as necessarily included in the collateral felony charged in the murder indictment. And since the act established by the evidence was not shown to have amounted to arson (People v. Knatt, 156 N. Y. 302, 305) nor, so far as I have been able to determine, was it otherwise specifically penalized by law (Penal Law, § 1421; People v. Costello, 305 N. Y. 63, 65; Hazak Inc. v. Robertson Goetz Bldg. Co., 298 N. Y. 478, 480) it could be and was submitted as the misdemeanor predicate of manslaughter in the first degree (Penal Law, § 1433, subd. 2; § 1050, subd. 1; People v. Koerber, 244 N. Y. 147, 152-153; People v. Levan, 295 N. Y. 26, 33, 34; People v. Draper, 278 App. Div. 298, 306, affd. 303 N. Y. 653). However, before that point was reached there was a denial of the District Attorney’s request that the case be given to the jury as deliberate and premeditated murder (Penal Law, § 1044, subd. 1).
4. Because even if that theory could have been considered under the form of the indictment in his case[22] (see, e.g., People v. Collins, 234 N. Y. 355, 364), it would be more accurate to say *515 that the evidence negated any sneh possibility, than it would be to remark that there was no evidence to justify its submission.
The error, if any, in the decisions and ruling in accordance with this reasoning, is limited to the determination that the evidence did not establish, prima facie, that defendants intended to set fire to the hotel and that a positive intent to do so was essential to their guilt of the felony on which their responsibility for first-degree murder depended. But the verdict of the jury negated other facts on which the success of the subsequent arson prosecution also depends.
First, to prove defendants’ guilt of the arson, the People must show, beyond reasonable doubt, that Boderman and Dowd “ wilfully ” burned or set fire to the hotel (Penal Law, § 221) and, as noted, the evidence that defendants intentionally fired the mop was the means by which the prosecution undertook to prove their criminal agency. But in finding the defendants not guilty of the crime of manslaughter in the first degree, the jury necessarily decided that they had not “ intentionally ” burned the mop.
In the instruction covering the subject, the jury were told, in substance, that they might convict defendants of manslaughter in the first degree if satisfied beyond reasonable doubt that they had committed a criminal homicide (it was not criminal if excusable as defined by law) although without any design to effect death, through their engagement in the commission of a misdemeanor affecting the person or property of the person killed, or of another (Penal Law, §§ 1049,1050, subd. 1). “ [y] ou are therefore to determine ”, the instruction (here abridged) went on, ‘1 the guilt of either or both * * * as a result of «* * * having caused the death by committing * * * a misdemeanor * * * we call Malicious Mischief. Our law provides that any person who unlawfully and wilfully destroys or injures any real or personal property of another, commits the misdemeanor of Malicious Mischief ” (Penal Law, § 1433, subd. 2). The instruction continued: “ You will note * * * that the word ‘ wilfully ’ is used; that means intentionally. In the instance before you that means that before you can convict either * * * of the crime of Manslaughter in the First Degree, you must be satisfied beyond a reasonable doubt that either (or) both * * * intended to injure or destroy any personal property in that closet.” They were told, further, that the law permitted them to “ determine a person’s intent from what happened in the circumstances under consideration. ’ ’ This was part of the charge reread to the jury in response to its request for a redefinition of manslaughter and ‘‘ excusable *516 manslaughter ’ ’. Without the request, I would experience no difficulty in concluding that the jury had necessarily decided, against the People, a fact — equally critical to guilt of malicious mischief and arson — that defendants had intentionally set fire to the mop and other personal property in the closet. The request adds to certainty in identification of the issue of fact determined by the prior adjudication. And 11 [i]t was always the law that to set fire to or burn a house by negligence or mischance * * * was not arson ” (People v. Fanshawe, 137 N. Y. 68, 76, supra) “ it must be a malicious burning: otherwise it is only a trespass: and, therefore, no negligence or mischance amounts to it ” (4 Black. Com. 222); “ It seems clear that if the fire happened through negligence or mischance, it cannot make him who is the unfortunate cause of it guilty of arson ” (1 Hawk. P. C. [7th ed.], 298). I hold that the prior verdict acquitting the defendants of manslaughter in the first degree necessarily decided that they did not fire the chattels intentionally ; that the prosecution is precluded from relitigating that issue upon the trial now sought to be had on the arson indictment; that establishment of the fact, to the contrary of its adjudication in the felony-murder case, is necessary to the success of the arson prosecution; that the latter is, consequently, defeated and that the indictment ought to be, and it is, dismissed on that ground. But the prior verdict was even more clearly determinative in that it also necessarily decided that the defendants were not guilty of an act of culpable negligence whereby the fire was started and the death caused.
In earlier instruction, the jury’s attention had been directed to the defense of excuse, based on accident. Excusable homicide was defined, in substance, as the taking of life by accident and misfortune, in doing a lawful act, by lawful means, with ordinary caution and without an unlawful intent (Penal Law, § 1054) and the jury were advised to acquit of any criminal homicide in the event of reasonable doubt as to whether the homicide was excusable or criminal. Immediately following the charge on first-degree manslaughter they were instructed to consider defendants’ innocence or guilt of manslaughter in the second degree which, in view of the evidence, was defined as a killing, without design to effect death, by an act, procurement or culpable negligence of the accused, not constituting a more serious grade of criminal homicide. (Penal Law, § 1052, subd. 3.) In substance, “ culpable negligence ” was contrasted with ordinary negligence, as involving action taken with knowledge of facts that ‘1 would disclose to a reasonable man the dangerous character of his action. That he does not view his conduct as *517 dangerous is of no consequence. His lack of realization * * * may arise from Ms abnormally reckless temperament; but to be dangerous, Ms conduct must involve a reasonable probability of serious bodily harm or death.” Criminal negligence was epitomized as “ a wanton disregard of human life * * * ” and as to Roderman’s possible status as a principal they were told, in pertinent substance, that “ a principal * * * must have a conscious awareness of the danger involved and consciously disregard a substantial and unjustifiable risk of death or serious injury to another.” This too, was part of the instruction reread at the request of the jury. I hold that by its verdict of not guilty of manslaughter in the second degree, the jury necessarily decided that defendants started the fire accidentally, but not in such manner as to amount to criminal negligence, and that the determination of fact confirms the conclusion drawn from the acquittal of manslaughter in the first degree. My view of the justice of the verdict is beside the point. The question is whether, under the law, any defendant so situated should be subjected to successive prosecutions for the same conduct and not whether these defendants have benefited from undeserved mercy, dispensed by the jury. The District Attorney who feels that judicial error has enabled a trial jury to escape its obligations as keeper of the community’s conscience, and the critic who would curtail the exercise of the District Attorney’s resourcefulness with a thesaurus and a statute book would do well to join in an appeal to the legislative committee engaged in studies looking toward revision of the laws of the State.
Meanwhile, there is no answer that would satisfy the logicians. Whereas it is supposed that the common law ruled the roost in the New York law of crimes only until 1829 it is quite evident that the courts have kept it around to peek at its successors.[24] The fiction of ‘ ‘ implied malice ’ ’ was retained in the law although the revisors whose work was, in the main, enacted into the Revised Statutes, clearly intended to correct the abuses that had followed its application in the common law. Their definition of murder was the first step in an effort to create a clear line of distinction between murder and manslaughter and while they had drawn upon the writings of Hale, Hawldns, Foster, Blackstone and East, they significantly shunned Coke (Revisor s’ Reports and Notes, 3 R. S. 808, 809) (2d ed.) who, in Stephen’s opinion, had developed “ implied malice ” into a *518 ‘‘ monstrous doctrine ” (3 Stephen, Hist. Crim. L. Eng., 75).[25] Even at that, there is doubt whether the fiction actually had any standing in the truly ancient common law.
Stephen traces the origin of the expression “ malice aforethought ’ ’ back to the late thirteenth or early fourteenth century (3 Stephen, op. cit., pp. 50-51, supra) through Fitz Herbert, according to whom (3 Corone, 284-286) a man who had taken life in self defense avoided the death penalty only if the jury, by special verdict, found that he had, in fact, taken his adversary’s life “in self defense, and not by felony or of malice aforethought ” (emphasis supplied). Unadorned by fiction, the law bluntly warned the wouldbe felon that he would pay with his life for the unintended death of his victim if that were the result of a dangerous felony. There was no need of a fiction to translate into law the lessons gained from experience gathered in the centuries that followed the exposition of the parable of the Good Samaritan (Luke, 10, 23-27). And the law was well-grounded on substantial considerations of public safety, besides proclaiming a rule that the average Englishman would not find it too hard to understand (Holmes, op. cit., 51-56, supra). The fiction, or so Stephen thought, may have originated in Lam-bard’s hyperbole (Eirenarcha, 214) (1610) that a robber is assumed to be disposed to kill, if need be, for the intended gain (3 Stephen, op. cit., 38, 39, supra). Perkins agrees on the source as the cornerstone in the foundation for the different meanings of “express” and “implied” malice (A Reexamination of Malice Aforethought, 43 Yale L. J. 537, 547) (1934). “ This implication of a species of malice which did not exist seems to have been invented for the purpose of bringing cases of constructive murder, so called, within what was supposed to have been the legal definition of the crime ” (Darry v. People, 10 N. Y. 120, 136, Selden, J.) in the era of formalism. Obviously, it Avas an idle formality for, as at common laAv practically all felonies Avere punishable Avith death, either Avith or without benefit of clergy, the imputation of intent actually made no difference ‘ ‘ for it Avas considered immaterial whether a man AAras hanged for one felony or another” (Powers v. Commonwealth, 110 Ky. 386, 413). One rope was as good as another, if it would hold the weight. But the Revdsed Statutes defined criminal homicides in new phraseology intended to dispel the obscurity created by the various uses of the words “ express ” *519 and “ implied malice ” and to give the new laws the effect they were intended to have, it was necessary “ to construe the new terms * * * according to their plain and natural import. A resort to the rejected terms, in order to interpret those newly adopted, would obviously reinvest the subject with much of the previous uncertainty, and render abortive this attempt at elucidation ” (Darry v. People, 10 N. Y. at 136, Selden, J., supra).
But the court that decided the Enoch case thought otherwise (People v. Enoch, 13 Wend. 159, supra) and the common law’s domination of the area was maintained by the opinion in the Buel (18 Hun. 487, affd. 78 N. Y. 492, supra) Huter (184 N. Y. 237, supra) Nichols (230 N. Y. 221, supra) and Lytton (257 N. Y. 310, supra) cases. The correctness of the result was confirmed by the common-law tests of indictability and convictability and the doctrine of merger which, in the final analysis, means what the courts say it means in the light of statutory, substantive law (State v. Cooper, 13 N. J. L. 361, supra [1833]). And the common-law tests of the defendant’s susceptibility to indictment and conviction are no longer valid.
In 1936 our joinder practice was liberalized (L. 1936, ch. 328) by amendment of section 279 of the Code of Criminal Procedure. With a moderate exercise of editorial liberty, the statute may be outlined as now providing that, instead of having separate indictments for different crimes, a single indictment may contain counts making separate charges [1] for the same act or transaction, and constituting (A) different crimes, or (B) the same crime alleged to have been committed (1) in a different manner, or (2) by different means, or [2] for tioo or more acts or transactions either (A) connected together, or (B) constituting parts of a common (1) scheme or (2) plan, or [C] constituting crimes of (1) the same character, or (2) of a similar character. Further, if two or more indictments are found in such cases, the court may order them to be consolidated, without regard for any difference in penalties, provided however, that where the charges involve different acts[26] or transactions constituting crimes of *520 the same or a similar nature, but neither connected together nor parts of a common scheme or plan the court, in the interests of justice and for good cause shown may, in its discretion, order that they be tried separately. Through the statute, the Legislature appears to have both declared and implemented a more realistic policy which does not compromise the interests to be protected, for the law still supplies the fundamentals of fairness which the common-law tests of indietability and convictability were meant to subserve.
The defendant is apprised of all of the charges, he cannot be convicted by surprise and he can, of course, identify his former jeopardy. He is not unfairly prejudiced by accusation of different charges for acts or transactions connected together or forming part of a common plan, for in some instances the evidence of their commission is an inseparable part of the case against him and in others, it is legitimately received when its probative relevance and force clearly outweighs any incidental prejudice involved. On the other hand, the prosecution will not fail entirely if the evidence makes out guilt of a crime charged, or “ necessarily included ”, or of inferior degree or of an attempt. In at least one recent case the District Attorney of Nassau County, with a commendable sense of fairness, brought all of the issues to trial under one indictment, with appropriate separate counts. That, however, is a matter of choice, and if the prosecutor elects to wait and see, he can avoid consolidation of separate indictments (by order of the court) by simply asking his Grand Jury for a murder indictment alone. Whether a different course of action should be compelled is a policy decision to be made by the Legislature which would, no doubt, be equally concerned about giving the People one fair try at convicting the defendant by means of a trial free from substantially prejudicial error. The reality of the present is, that the District Attorney is free to decide how he will proceed. Whether he can forestall a former jeopardy plea by a common-law form of murder indictment is another question.
Although there is nothing to prevent execution of the maneuver (People v. Lytton, 257 N. Y. 310, 315) reason opposes its success. Some decisions tend, however, to encourage the idea by their *521 interpretation of the provisions of section 445 of the Code of Criminal Procedure as a codification of the common law, including its barrier to surprise convictions. Thus, since the indictment specifically charged the facts constituting a lesser included offense and the evidence made out the defendant’s guilt thereof, the Fifth Department of the General Term affirmed a conviction of neglect of child under a manslaughter indictment based on the neglect (People v. McDonald, 49 Hun 67 [1888]). Later (1911) the First Department affirmed an unlawful entry conviction under a burglary indictment, quoting the McDonald opinion with apparent approval (People v. Miller, 143 App. Div. 251 [256-257], affd., 202 N. Y. 618, on the opinion below, supra). The Second Department, in turn, relied on Miller in affirming a sodomy conviction under a felony-murder indictment (People v. Colburn, 162 App. Div. 651, 654 [1914]). Despite the “ iffy ” evaluation made of the Miller opinion by the Nichols court (230 N. Y. 221, 228) and the “ substantive and generic ” differences (People v. Zielinski, 247 App. Div. 573, 574) the McDonald opinion invites respect (see, e.g., Comment, 25 Fordham L. Rev. 111, 112-114) (1956). On the other hand, the Colburn case has been reduced to anonymity as a “ troublesome decision ” in the Second Department (Comment, 26 Brooklyn L. Rev. 299, 300, fn. 14). Aside from joinder innovations just discussed, “ [t]hc form of the indictment cannot obscure the reality ” (Crane, J., dissenting in People v. Lytton, 257 N. Y. 310, 317, supra) especially when “ surprise ” can be averted by a bill of particulars (People v. Bogdanoff, 254 N. Y. 16, 24, 25, 31, 32). But even more fundamentally, the application of the constitutional safeguard does not hinge on “ a mere matter of formal pleading * * ®. A test is sot .up which considers evidence and not the theory of the pleader ” (People v. Silverman, 281 N. Y. 457, 462). The thesis of the dictum in the closing phase of this opinion is, of course, that in the twentieth century administration of criminal justice, procedural and substantive law should be governed by reality and not by fiction.
To the common law we owe the respect due the venerable, but not perfect ancestor of our statutory law. Its precepts help us to understand the intendment of changes since made, but should not be allowed to defeat their purposes. We have put aside the old ideas that a defendant, if shown to have killed, is presumed by law to have done so feloniously and maliciously (arguments for the prosecution, People v. Enoch, 13 Wend. 159, 164, supra),[27] *522 that a burglar who unintentionally sets a house afire is guilty of arson (People v. Fanshawe, 137 N. Y. at 76, supra) and that the defendant should neither be allowed to call witnesses nor testify in his own defense, nor have the assistance of an attorney because, by “ noble declaration of the law” the Judge would serve as his counsel (4 Black. Comm. 355, 359). Escape by variance is no longer a reproach, although some still complain about the mild manner in which the laws are administered. Yet, in effect, stare decisis insists that we continue to yield to the argument — for the sake of a prosecutor’s convenience — that “ [t]he forms of process and pleadings are a part of the common law, and should be preserved.” (Arguments for the Prosecution, People v. Enoch, 13 Wend, at 168, supra). A recognition of the reality instead of the resort to fiction in homicides resulting from collateral criminal activity would, obviously, make only a small contribution to constitutional relief from successive prosecutions. It would, however, involve a reconsideration of our position, and a court, although disposed to raise the standards of fairness in the prosecution of crimes (see, e.g., People v. Di Biasi, 7 N Y 2d 544; People v. Spitaleri, 9 N Y 2d 168; People v. Rosario, 9 N Y 2d 286; People v. Waterman, 9 N Y 2d 561; People v. Noble, 9 N Y 2d 571), might well consider that any such undertaking should be left to the Legislature, because of the policy decisions and procedural implementation required. If, in the performance of that task, the revisors set out to banish the doctrine of “ implied malice ”, they will do well to see that it cannot be returned to the roost by way of the back door.[28]
Order in accordance with decision announced on the first page of this opinion is made herewith.

. 'Pleas of former acquittal were previously entered by leave of the court. Permission to enter formal pleas of res judicata was denied (Code Grim. Pro., § 332) but their tender is regarded as sufficient to present the collateral-estoppel issue for determination, on the merits,

. The entire record of the proceedings in the felony-murder case, from indictment to judgment, including the trial-evidence, exhibits, jury instruction (but not the summation) and the proceedings upon and after the verdict, was, considered in deliberation upon these motions. Financial difficulties caused delay in defendants’ compliance with the court’s direction that the trial record be submitted. Also considered, was the record in the arson case, from indictment to date. The content of the Grand Jury minutes in each ease is known to the court, through prior motions to inspect and dismiss. Both indictments were found upon the same evidence, recorded in a single set of Grand Jury minutes.

. Transcripts of statements (in evidence at the felony-murder trial) elicited by an Assistant District Attorney and recorded by a stenographer, are barren of any acknowledgment of intent to set fire to the structure. The assistant did not ask any direct questions on that subject although, before commencing his interrogation, he had been “ briefed ” by the police as to “ the general story ” that the defendants had told them. As developed in detail on the trial, the “general story” admitted an intent “to make some smoke” and “to annoy the bartender ” but at no time did either defendant say that he intended to set fire to the hotel.
Prior to the prosecutor’s arrival at the police station Dowd’s brother (an attorney) was refused permission to consult with the suspect. He was told that he would have to wait until Dowd had been questioned by the Assistant District Attorney. Dowd’s later effort to talk to his brother was defeated by a police lieutenant’s order to “ get that lawyer * * * out of here ”, but not in those words.

. The indictments were consecutively numbered and handed up the same day, as were two earler indictments thereby superseded.

. Defendants contended that the indictment, drawn in common-law form, was fatally defective for its failure to charge the murder in the language of the statute (Rev. Stat., part 4, tit. 1, eh. 1, § 5,1st ed., vol. 2, pp. 656, 657) which, so far as here pertinent, defined a criminal homicide as murder “ When perpetrated from a premeditated design to effect the death” etc. (subd. 1) and “When perpetrated without any design to effect death, by a person engaged in the commission of any felony” (subd. 3). The absence of “premeditated design” was also *501 embodied in the definition of murder by an act imminently dangerous, etc. (subd. 2).
The District Attorney and the Attorney-General urged that if a statutory-form indictment were mandated “ great evils ” would follow from any variance between the allegation of intent and the proof (13 Wend., supra, p. 169) and worsen the “ blemish ” already put upon the law by the “ mild manner in which the laws are administered ” (id., 171, 172 citing 2 Hale, P. C. 193 and 1 Chitty, Cr. L. 171). The court held that the Legislature had not created a new crime, that the indictment need not be in statutory form and that the common-law form continued to be good for all of its former purposes.

. The statute (3 Rev. Stat. [6th ed., 1875] 1022, § 51) permitted joinder of different degrees but the common-law joinder of counts for different offenses “within the same transaction” continued to and after adoption (1881) of the Code of Criminal Procedure. (See, e.g., Kane v. People, 8 Wend. 203, 211 [Ct. of Errors, 1831]; Hawker v. People, 75 N. Y. 487, 489, 490 [1878]; People v. Infield, 1 N. Y. Crim. 146, 147 [Gen. Sess., 1882].) The joinder of “incongruous” and “ repugnant ” offenses was forbidden as involving prejudice to the defendant, but the prosecution was not permitted to fail if defendant’s guilt of a fairly included offense was made out.
On objection raised by motion to quash or to compel an election, the Judge decided whether the offenses were “ indictable ” together and, necessarily, whether they were “ triable ” together. He obviated a surprise-conviction in the first instance by deciding whether a lesser crime, not charged, was included in the major offense actually charged, as a matter of law. If so, defendant was deemed to have been warned of the possibility of his conviction thereof. In the second instance, he controlled the jury’s action by his instruction as to their permissible verdicts in the light of their possible views of the evidence. (See, inter alia, 4 Hawk. P. C. [7th ed.] 29; 1 Chitty, Cr. L., [3d Amer. ed.] 248-254; People ex rel. Poulos v. McDonnell, 302 N. Y. 89, 91; People v. Santoro, 229 N. Y. 277, 281, 284; People v. Miller, 143 App. Div. 251, 256, affd. (on opinion below) 202 N. Y. 618; People v. Klipfel, 160 N. Y. 371, 376; De Dieu v. People, 22 N. Y. 178, 183-184; People v. Connors, 13 Misc. 582, 585; People v. Rynders, 12 Wend. 425, 429-430.)

. Justice Fisher’s allusion to “ crimes not charged in the indictment ” had reference, of course, to separate counts and not to the form of the indictment. Whether the District Attorney can use the common-law form of indictment to foreclose a former jeopardy plea is discussed later (pp. 30, 31, infra).

. Or the “essential ingredient” (“element”) test, as to which (see, among others, State v. Barnes, 29 N. D. 164, 169-170; State v. Smith, 43 Vt. 324, 326-327; see, also, Comment, 21 Louisiana L. Rev., 615, 619 [1961]; Note, 35 Tulane L. Rev., 430, 431 [1961]). The statute referred to in State v. Carlson (5 Wis. 2d 595, 608, 609 [infra]). (Criminal Code, § 939.66) provides that “[u]pon prosecution for a crime, the actor may be convicted of either the crime charged or an included crime, but not both. An included crime may be * *' *: (1) a crime which does not require proof of any fact in addition to those which must be proved for the crime charged” (41 West’s Wis. Stat. Anno., 78).

. Kirckheimer: The Act, the Offense and Double Jeopardy, 58 Yale L. J. 513, 515 (1949).

. The late Justice Holmes, discussing criminal responsibility for foreseeable consequences, reasoned that fairness to the individual only required the lawgivers “ to make a rule which is not too bard for the average member of the community ” (Holmes, The Common Law, p. 57) (1881).
In 1848 the Erie General Term laid down such a rule in the former jeopardy area (fn. 11, infra) in holding that a prior conviction of an assault and battery did not bar prosecution from manslaughter upon the victim’s later death. The average people of the community would not find it too hard to understand from the rule that the “ act ” involved the intent and the deed, including its injurious or deadly quality (“character”). That is precisely the standard of the contemporary New York law of assault as, e.g., when committed by “means or force likely to produce death” or administering a substance “destructive or noxious * * * so as to endanger * * * life ” (Penal Law, § 240); or a “ * * * drug '■* * * dangerous to life or health” {id., § 242 subd. 1); or a “weapon, *504 instrument or thing likely to produce grievous bodily harm” (id., subd. 4). Other such instances abound in the law of manslaughter (Penal Law, § 1050, subd. 2 and § 1052, subd. 3). And an- “act imminently dangerous to others” amounts to first-degree murder when death results therefrom (Penal Law, § 1044, subd. 2, emphasis supplied; see, also, id., subd. 4).

. Instant death may come to a cardiac victim from a preparatory threat, offer or use of violence by a would-be rapist or robber. Yet the event of death, “ strictly speaking, does not change the character of the act, but it relates back to the time of the assault and the same act * * * is in truth shown by that event to have been a mortal wound, and the crime * * * is thus shown to be a capital felony * * The acts of the defendants are the same, but the event has shown that those acts were felonious. The event relates back to the acts and gives them a new character, and * * * the prisoners were never guilty of an assault and battery, as the misdemeanor is merged in the higher offense of felony.” (Burns & Cary v. People, 1 Park. Crim. 182, 185, 186, following Commonwealth v. Roby [“Raby”], 12 Pick [29 Mass.] 496).
Conversely, if the violence with intent to commit the felony is not found to have caused the death, does not the failure of proof of the defendant’s agency establish that his “ act ” was assaultive only and that he was “ never guilty ” of the homicide ? The Di Lapo jury, under the instruction of the court, could' have found that the shot was fired in the course of the felony attempt, but that the death did not follow because of the gunshot wound. (People ex rel. Santangelo v. Tutuska, 19 Misc 2d at 310 (supra).

. In addition to the eases collected in People v. De Sisto (27 Misc 2d 217, 258) see People v. Rodgers, 184 App. Div. 461, 465 [1918], affd. 226 N. Y. 671 (supra); People ex rel. Rosebrough v. Casey, 251 App. Div. 867 [1937]; People v. Engel, 8 A D 2d 619 [1959] (dissent), revd., 7 N Y 2d 1002; People v. Dreares, 15 A D 2d 204, 206 [1961]; People v. Gans, 33 N. Y. Crim. 179, 180, 183 [1915]; People v. Parelli, 93 Misc. 692, 693-694 [1916]; People v. Rogers, 102 Misc. 437, 442 (same ease as 184 App. Div. 461, supra) [1918]; People ex rel. Kwiatkowski v. Trenkle, 169 Misc. 687, 693-696 [1938]. In People ex rel. Todd v. Brennan (254 App. Div. 866) the pretrial ruling in People v. Kleinman (168 Misc. 920) was held to he an encroachment upon the powers of the trial court (co-ordinate jurisdiction).

. “ The doctrine of res judicata, by which a fact or matter distinctly put in issue and directly determined by a court of competent jurisdiction cannot after-wards be disputed between the same parties” (15 Am. Jur., Criminal Law, § 37; Anno: 147 A. L. R. 991, 992).
“ The doctrine which operates, following a final judgment, to establish conclusively a matter of fact or law for the purposes of a later law suit on a different cause of action between the parties to the original action” (Polasky, Collateral Estoppel — Effects of Prior Litigation, 36 Iowa L. Rev. 217, 218 [1954]).
Its extension to a prior adjudication on a question of law involves policy-considerations, including its potential for the perpetuation of error, especially in criminal causes. Only a few jurisdictions ■ — of which New York is not one — have undertaken to give the State a right to appeal from a judgment of acquittal induced by error. (See Mayers & Yarbrough, Bis Vexari, etc., 74 Harv. L. Rev. 1, 8-14, 32, 33.) The instant case may — and Green v. United States (355 U. S. 184) does- — illustrate the possibility.

. “A negative answer can usually be found by the court” (Lugar, Criminal Law, Double Jeopardy and Res Judicata, 39 Iowa L. Rev. 317, 334) (1952); “ the solar plexus of Res Judicata Criminal ” (Gershenson, Res Judicata in Successive Criminal Prosecutions, 24 Brooklyn L. Rev. 12, 32 [1957]; 25 Brooklyn L. R. 33 [1958]).

. They created a draft by opening a door whereas the trained fireman’s standard procedure (under the same circumstances) is to maintain a closure so as to confine the fire.

. Some courts reject the offer of the evidence when, if received, it would not establish the intervention of an independent cause (see, e.g., Dumas v. State, 159 Ala. 40, 44 [1909]) and others countenance its rejection (Commonwealth v. Williams, 304 Pa. 299, 302 [1931]; Hollywood v. State, 19 Wyo. 493, 513, 514 [1912]) but qualify the ruling with an admonition that as a matter of discretion, a “liberally wide latitude” should be allowed (Hall v. State, 199 Ind. 592, 604-605) [1928]).

. A statement by one of the defendants that they had gone to the Grassy Point to “break some backs” had reference to their intention to deal with any who might attempt to maintain the territorial dominion asserted the prior week. However, no such person was found in the tavern on the night of the fire.

. As will later appear, the manslaughter, first degree, based upon a misdemeanor, was submitted to the jury upon the same view of the necessity of an affirmative intent.
Reference to “ specific intent ” is avoided because it tends to blend particular motivation, as a cause, with intent, as the effect. Bishop’s treatment of intent element (2 Criminal Law, p. 10 [9th ed.]) in that vein was adopted in State v. Colgate (fn. 19, 31 Kan. 511, 518, infra).

. In the Fanshawe ease part of the charge posed the question: “Did the defendant wilfully, that is intentionally, hum or set on fire * * * the premises * * * ? ” (137 N. Y. at p. 70). From the opinion below (65 Hun 77) it appears that a requested charge was amended so as to tell the jury that “If * * * the building * * * was burned or set on fire, with no intent on the part of the defendant to bum or set the same on fire, it is not arson, and no conviction can be had under the indictment” (p. 92). In accord with the idea that “wilfully” means “intentionally,” see People v. Katz, 290 N. Y. 361, 365: “ as the statute reads, the requirement as to intent is eo-extensive with the act prohibited.” (Contra, see State v. Colgate, 31 Kan. 511, 518, 520.)
The case that probably brought about amendment of the statute (I. N. R. L. 407) so as to include the “set on fire” verbiage (2 R. S. 657, see. 9) (1st ed.) was People v. Cotteral, 18 Johns 115 (1820) in which the court staved off a death penalty by holding that the defendants had sustained their burden of showing that “it was no part of their intention to burn the gaol” (p. 120). (See, also, State v. Mitchell, 27 N. C. [5 Ir. L.] 350 [1845]; People v. Long, 2 Edm. Sel. Cas. 129 (1849); Jenkins v. State, 53 Ga. 33, 35 [1874].)

. The analysis proceeded on the greatest effect that could reasonably be given to the admissions. Even at that, Roderman’s knowledge of and concurrence in Dowd’s (admitted) purpose was not apparent in the content of the recorded statements. When the case was resubmitted to the Grand Jury, the weak link in the chain was strengthened by police testimony of further verbal admissions by Roderman.

. He parked Ms cab under the building, near the lavatory, at about that time. It was shortly afterward that the fire was detected.

. Each count alleged in detail, facts amounting to felony murder and concluded with what was, in effect, a plea of “ transference of malice,” by further alleging, in substance, that in consequence of the acts specifically pleaded, defendants had killed the victim willfully, feloniously and of their malice aforethought. It did not, however, go on to allege that the deed was contrary to the peace and dignity of the People of the State of New York, etc.

. Snyder, The New York Penal Law and Theories of Punishment, 21 Brooklyn L. Rev. 12, 14 (1954).

. As late as 1877 an Irish court was divided on the imputation of “ malice ” to a sailor who had accidentally set a ship afire while trying to get an unauthorized ration of rum, by candlelight, from a cask in the hold (Regina v. Faulkner, 13 Cox C. C. 550).

. In view of the expert assistance given to the Legislature in the drafting of the statute, it may be assumed that the lawmakers were not unmindful of the nuances so important to the philosophers. Since they went ahead and used the word anyhow, it seems equally fair to assume that they simply declined, to he confused as to its meaning. The aet-intent-coneept of the Erie General Term has already been noted (footnote 11, supra). The Burns and Cary ease was not left to be buried in the archives (People v. McCloskey, 5 Park. Crim. 57, 59; People v. Cramer, id., 171, 178 [1860]; Canter v. People, 2 Tr. Ap. [36 N. Y.] 1, 3, Abb. Pr., N. S., 21, 27, 38 How. Pr. 91, 93 [1867]; Buel v. People, 18 Hun 487, 493 [1879], supra). The decision thought to have been instrumental in the amendment of section 444 of the Code of Criminal Procedure mentioned *520 it as “ very good authority ” (People v. McDonald, 159 N. Y. 309, 314) and in acting on the necessity suggested by the decision, the Legslature saw fit to amend the section so as to provide that “if the act complained of” (emphasis supplied) were not shown to be the cause of death, there could be a conviction of assault in the degree warranted by the evidence. What is meant, of course, is the violent deed and the attendant intent, as limited by the indictment theory and as indicated by the evidence (People v. Santoro, 229 N. Y. 277, 285, supra).

. Of course, if a prima facie case is marie out against him he must, as a practical matter, come forward with enough evidence to at least bring his responsibility into reasonable doubt (People v. Sandgren, 302 N. Y. 331, 334).

. See Collings, Negligent Murder, Some Stateside Footnotes, etc., 49 Cal. L. R. 254, 287 (1961).